Charles CLAUSON, Plaintiff, Appellant,

v.

Robert D. SMITH, Defendant, Appellee.

No. 86–2019.

United States Court of Appeals,
First Circuit.

Argued June 3, 1987.

Decided July 7, 1987.

As Amended July 17, 1987.

David B. Kaplan, with whom Thomas M. Bond, Chelsea, Mass., Paul V. Gallogly and Lovett, Schefrin & Gallogly, Providence, R.I., were on brief, for plaintiff, appellant.

Steven E. Snow with whom George Cameron Nixon, Erica M. Eisinger and Tillinghast, Collins & Graham, Providence, R.I., were on brief, for defendant, appellee.

Before COFFIN, DAVIS[*] and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Before the birth of Christ, the elegist Sextus Propertius had told all of Rome—or that part of Rome which was prone to listen—that "the seaman's story is [one] of tempest." This appeal comprises yet another proof of that enduring wisdom.

I

Charles Clauson, plaintiff-appellant, was severely injured on June 9, 1980 while working aboard the F/V David D. The vessel was captained by its owner, Robert D. Smith, defendant-appellee. On October 2, 1985, more than five years later, Clauson filed suit against Smith for bodily injury in federal district court. Clauson's complaint contained three counts: negligence under the Jones Act, 46 U.S.C. § 688; unseaworthiness; and maintenance and cure.

■ By the time the case was reached, the parties had resolved the matter of maintenance and cure.[1] The district court held an evidentiary hearing as to the timeliness of the Jones Act claim. Finding this count to be time-barred, the court dismissed it and discharged the jury. A bench trial ensued on the cause of action for unseaworthiness. At the close of all the evidence, the court exonerated Smith on the merits. The plaintiff appeals both the dismissal of Count I and the verdict on Count II.

We review the factbound findings of the district court sitting without a jury in admiralty jurisdiction under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *See McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 722 (1st Cir.1984); *Pinto v. M/S Fernwood,* 507 F.2d 1327, 1329 (1st Cir.1974).

[*] Of the Federal Circuit, sitting by designation.

1. The time constraints associated with such claims are, in a sense, *sui generis.* Maintenance and cure are ongoing. The obligation continues to vest until the incapacity is, from a medical standpoint, declared permanent (and an optimum cure effected). *See generally Vella v. Ford*

In this case, such scrutiny reveals that the trial stayed well on course. Accordingly, we affirm.

II

The Jones Act, 46 U.S.C. § 688, incorporates by reference the three year limitations period contained in the Federal Employers' Liability Act (FELA), 45 U.S.C. § 56. The plaintiff concedes that this period expired before he sued. He explains, however, that the circumstances are such that the defendant, Smith, should have been estopped from raising the preclusory bar.

■ We know on the best of authority that equitable estoppel can toll the statute of limitations in FELA suits. *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232–35, 79 S.Ct. 760, 761–63, 3 L.Ed.2d 770 (1959). Inasmuch as the Jones Act "borrows" FELA's statute of limitations, *see Engel v. Davenport,* 271 U.S. 33, 38–39, 46 S.Ct. 410, 412–13, 70 L.Ed. 813 (1926), it must follow that estoppel is equally available to a late-arriving seaman in a Jones Act case. The caselaw so holds. *See, e.g., Sanchez v. Loffland Bros. Co.,* 626 F.2d 1228, 1231 (5th Cir.1980) (per curiam), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *Burke v. Gateway Clipper, Inc.,* 441 F.2d 946, 948–49 (3d Cir.1971) (per curiam). We join in this view.

■ Generally speaking, there are four elements to a classic estoppel in pais:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Motor Co.,* 421 U.S. 1, 4–6, 95 S.Ct. 1381, 1383–84, 43 L.Ed.2d 682 (1975); *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 201–02 (1st Cir. 1980). Although the doctrine of laches applies, serial suits are permitted to collect benefits as they accrue. *E.g., Pelotto v. L & N Towing Co.,* 604 F.2d 396, 401 (5th Cir.1979).

*Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Put another way, one may be "estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made." *Bergeron v. Mansour,* 152 F.2d 27, 30 (1st Cir.1945). *See also Sea-Land Service, Inc., v. R.V. D'Alfonso Co.,* 727 F.2d 1, 2 (1st Cir.1984); *Precious Metals Assoc. Inc. v. Commodity Futures Trading Comm'n,* 620 F.2d 900, 908–09 (1st Cir.1980). In the present context—forfeiture of the defendant's right to repose—estoppel boils down to the idea that "the conduct of the defendant must be so misleading as to cause the plaintiff's failure to file suit." *Sanchez,* 626 F.2d at 1231 (footnote omitted).

Although estoppel was available to Clauson in theory, there was little in the way of proof to suggest its availability in practice. It is true that Samuel Snow, the defendant's insurance broker, met with the appellant at Smith's home approximately three months after the mishap. There was evidence that the injury was talked about in general terms, that the possible need for future surgery was brought up, and that Snow asked the appellant to assemble some medical reports and bills. According to Clauson, the conversation went, in part, along the following lines:

> As far as when I wanted to settle, Mr. Snow just said that any time that I was ready that I could get together with him, but I didn't want to settle then.... [2]

There was no evidence that the statute of limitations was mentioned, let alone discussed. Indeed, Clauson assured Snow and Smith that there was no possibility of a suit under any circumstances.

The appellant seems to lay great emphasis on some cursory comment, during this same conversation, about the status of an injury which he sustained in 1972. The allusion was cryptic to begin with; there was, for example, no indication of how the 1972 injury happened or where it occurred. Moreover, the musings were contradictory: at one point while on the stand, Clauson flatly stated that there was "no discussion about settlement" meant the 1972 injury. The district judge was plainly entitled to discount this enigmatic testimony. It proved next to nothing.

There was little more of any consequence stated or implied at this meeting. The three did not meet again. Clauson and the broker never discussed matters further within the limitations period, nor did the claimant deliver the requested medical data. Smith, himself, spoke with both Clauson and Snow from time to time, but was not alleged to have said or done anything to foster an estoppel.

We find it unnecessary to spell out the minutiae of the record in any greater detail. The district court ruled, on meagre facts such as those which we have delineated, that there was "no basis" for prohibiting a limitations defense. The court found no evidence either of deceptive conduct or of reliance sufficient to warrant this drastic a measure. We concur. Taking Snow's and Smith's conduct and statements, as described by the plaintiff, there was nothing of so misleading a nature as to induce a reasonable person to rely to his detriment. Particularly in the context at hand, the bland statement "any time [you are] ready" seems too frail a craft to carry the cargo which the appellant assigns to it. Furthermore, Clauson never said that he changed his position (*i.e.,* held off filing suit) because of what Snow or Smith had told him, and there is nothing in the record which would demand an inference that such was the case. Thus, two key elements of an estoppel—misrepresentation or

---

**2.** In the context of this discussion, as revealed in the trial transcript, Clauson's concern seems to have been limited to payment of his medical expenses (past and future). Inasmuch as the question of maintenance and cure (lately re-

misleading conduct, on the one hand, and reliance, on the second hand, were lacking.[3]

By their very character, claims of estoppel tend to be case-specific. "The nature of the representations and of the conduct of the defendant are of crucial significance in determining whether the plaintiff is to be allowed to invoke this equitable principle." *Sanchez*, 626 F.2d at 1231. In these important respects, the case at bar offers up far too little. Some definite, unequivocal behavior must be shown—conduct fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security. Equally, it must be demonstrated that the party seeking to enforce an estoppel relied to his detriment on the interdicted behavior. Neither side of the equation was fulfilled here. The law does not permit the gossamer strands of generalized discussion, taken alone, to tie the defense of limitations beyond reach; nor can reliance be implied out of desultory palaver, without more. So relaxed a rule, were we to recognize it, would be no rule at all. It would serve no purpose other than to leave injured persons free to sue without time constraints of any kind. We are not prepared to bury statutes of limitations at sea in such a casual manner.

It was for Clauson to carry the devoir of persuasion in order to demonstrate that an estoppel occurred. *See Ross v. Commissioner of Internal Revenue*, 169 F.2d 483, 496 (1st Cir.1948) ("it seems clear that a party who relies on an estoppel has the burden of proving its component elements"). He manifestly failed in this task. Accordingly, the district court had little choice but to dismiss the Jones Act count.

### III

The court below was left, as are we, with plaintiff's claim for unseaworthiness, a nonstatutory claim which invokes general principles of maritime law. We review the facts of the accident briefly.

The F/V David D was rigged for trawling off the starboard side. On the day in question, only Clauson and Smith were aboard. They had fished side-by-side for more than a decade. The men were using a winch to hoist the fishing nets. The system was a simple one. In order graphically to demonstrate it, we have reproduced as appendices two sketches which were marked for identification at the trial: Exhibits 1 (Appendix I) and 5 (Appendix II). Although these appendices are worth the proverbial thousand words, we will essay a prose description of the apparatus as well.

Two tow wires extended from the vessel through hanging blocks suspended from a gallows, down to the nets. Each wire was connected to a door, *i.e.*, a rectangular piece of equipment constructed from planking and weighted with a steel shoe. (The doors' function was to traverse the ocean bottom, thus keeping the nets open during actual fishing operations.) The portions of the tow wires which attached to the nets were called "legs".

The idler, an approximately seventeen foot length of chain, extended from one end of a door, then beyond the other end of the same door, parallel to the tow wires and connected thereto. When the doors were in use during fishing operations, the system placed the strain of the netting on the door, and the idler lay slack. When a net was hauled back, however, it was nec-

---

solved, *see supra* n. 1) was then an open one, that focus was understandable.

**3.** As the plaintiff points out, the district judge did at one time during colloquy with counsel use the term "fraud" instead of "misrepresentation." We acknowledge that fraud comprises too heavy a burden. For an estoppel to arise, "it is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by [his] conduct to induce delay." *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1071 (7th Cir.1978). Yet, taken in full context, there is no reasonable basis to believe that the judge was confused as to the law. Indeed, we think it

evident, given the skimpy fare which Clauson presented on the estoppel point, that the judge applied the proper criterion. We have held before, and today reaffirm, that if "[a] reading of the colloquy and decision as a whole ... indicates that, despite some loose use of language, the proper ... standard was applied," we will not reverse on the basis of what amounts to a *lapsus linguae*. *United States v. Kobrosky*, 711 F.2d 449, 456 (1st Cir.1983); *cf. United States v. Lebron-Gonzalez*, 816 F.2d 823, 830 (1st Cir.1987) ("obvious" slip of tongue in judge's charge to jury not ground for reversal).

essary to keep the door from obstructing the passage of the wires through the block. Thus, the doors were then detached from the tow wires and hung on the side of the gallows, transferring the strain to the idler.

If the idler was twisted when it was hauled up, it would have to be untangled before further hauling to prevent the twist from being transmitted into the legs. (As it was, the legs occasionally became snarled for reasons—say, bottom conditions—having nothing whatever to do with the idler.) The customary procedure was to unknot the idler chain while it was still slack. *i.e.*, before the doors had been taken out of the circuit. The idler which was in use on June 9, 1980 was long gone by the time of trial. The plaintiff offered testimony—disputed by the defense—that the chain was worn and stretched, and tended to "ride" under the door during fishing operations rather than to lie dormant and out of harm's way ("idle", one might say), as a good idler chain should.

The plaintiff testified that the accident occurred as he and the defendant were hauling in the nets. Smith was operating the hoister. Clauson was putting twists into the idler as a means of removing twists from the legs of the net—an operation which he had performed year after year, without incident. According to plaintiff, when it was necessary to put twists into the idler chain in order to unsnarl the legs, Smith would usually engage the hoister "very slowly and carefully."[4] Clauson would have to hold the idler with both hands while the hoister was activated and the chain began moving. On this fateful day, his clothing became enmeshed in the chain and his hand and arm were dragged into one of the hanging blocks severing his thumb.

The plaintiff's theory of the case at trial—the trial proper was limited to the claim of unseaworthiness; the Jones Act claim had been dismissed as time-barred and the maintenance and cure claim had been adjusted—was that defects in the idler consti-

tuted an unseaworthy condition which proximately caused the mishap. Smith, who did not actually see the accident take place, defended on a bouillabaisse of grounds: he asserted that laches was a bar, that the idler was not decrepit, and that the harm which befell Clauson did not stem from unseaworthiness attributable to the David D.

The district court, sitting without a jury, decided the case as a matter of proximate cause. The court found:

> The evidence is that the winch was at a stop, that the plaintiff was on the starboard side and attending to some function with respect to bringing in the lines. The ... winch was activated and ... shortly thereafter ... [the plaintiff's] left arm with his dominant hand had gone through the blocks apparently with the chains. There is really no evidence as to exactly how the plaintiff and the chain became connected to the point where the chain would drag his arm through the blocks....

> \* \* \* \* \* \*

> [I]f there is any liability under these circumstances it does not arise out of a worn idler chain.... [T]he circumstances admit of really only one explanation, that the winch was put into operation while plaintiff was holding the chain and got caught in it and that this situation [was] not observed by the winch operator [Smith] ... [T]here is no evidence from which I can find unseaworthiness so far as this vessel is concerned, that whatever the explanation of this injury is, it does not relate to the condition of the vessel.

In sum, it can fairly be concluded from the trial judge's remarks, taken in their entirety, that he believed the cause of the accident to have been, in his words, "the action of the hoist operator in activating the hoist without being certain that the plaintiff was clear of the chain."

We have examined the record in this case with care. Having done so, we do not believe that the district court's findings can

---

4. The defendant himself described the procedure in similar terms: "You go very slow with it until you are sure the man had stepped away from the chain and then begin to haul it in a normal force or fashion."

be set aside as clearly erroneous. The plaintiff concedes that "the fact that [Smith] did not stop the hoister in time was one cause of the accident," Brief for Appellant at 31, but argues that "the reason the legs were tangled was that the door was riding over the idler chain, causing it to roll and turn, and these turns were transferred to the legs of the net." *Id.* In the plaintiff's view, an idler chain which rode under the door was too long and too flattened by use, hence defective. Yet this thesis—that the injury eventuated because the idler was in disrepair—is highly speculative, given the holes in the proof. We need not decide whether the successive inferences which Clauson would have us draw were permissible on this record; what matters is that they were not by any means necessary or compelling ones. The factfinder was perfectly entitled to draw a divergent set of inferences—as indeed he did.

First and foremost, there is nothing of substance in the record to suggest that the idler was the cause of the twists in the net. During fishing operations, the chain had no tension on it, and would not transmit twists to the legs. The more likely inference from the evidence seems to be that the legs became tangled in the course of normal operations, as would occasionally happen irrespective of the (dis)repair of the idler. Thus, even if the injury occurred when Clauson was putting twists into the idler chain to straighten out the legs, the idler was not a necessary cause of the consequent harm. Then, too, for whatever reason Clauson was near the idler, the idler itself was—on one creditable view of the facts, at least—no more a "cause" of the accident than the hanging blocks. Given Smith's transitory carelessness at the controls of the winch, there is nothing to suggest that the *condition* of the idler contributed in any meaningful way to the misfortune which ensued.

On either scenario, the trial court's finding was fully supportable. The record bears out the conclusion that—apart from any consideration of the plaintiff's due care—the proximate cause of the mishap was the hoist operator's momentary inattention to duty. That was not enough to make out a claim for unseaworthiness, for "liability based upon unseaworthiness is wholly distinct from liability based upon negligence." *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971). As the Court has said, a shipowner is not "obligated to furnish an accident-free ship." *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). It is too well settled to warrant extended editorializing that a random bit of negligence— what the Court has called an "isolated, personal negligent act," *Usner,* 400 U.S. at 500, 91 S.Ct. at 518—is not the stuff of which unseaworthiness is fashioned. *See id. See also Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 888 (1st Cir.1978). The district judge, supportably, found that operational negligence lay at the heart of the matter: Smith's idiosyncratic failure, at just the wrong instant, to be more careful in running the (nondefective) winch and in keeping a prudent lookout. The judge's corollary determination—that the condition of the idler, whether or not substandard, was not a direct and substantial cause of the injury—is, we think, likewise unimpugnable.

■ The appellant runs one last banner aloft. He argues before us that the district court erred in entering judgment on Count II because, apart from whether or not a worn idler caused the accident, the vessel was actionably unseaworthy in other material respects. He says, for example, that the David D was short of crew, and also employed an "improper method" to untwist the legs of the fishing nets. We grant that a vessel can be found unseaworthy if not staffed by a proper complement or if inadequate manpower is assigned to perform a given shipboard task. *E.g., Waldron v. Moore-McCormack Lines, Inc.,* 386 U.S. 724, 726–28, 87 S.Ct. 1410, 1411–13, 18 L.Ed.2d 482 (1967). In the same vein, an "improper method" of loading or unloading a ship can render her unseaworthy. *E.g., Morales v. City of Galveston,* 370 U.S. 165, 170–71, 82 S.Ct. 1226, 1229–30, 8 L.Ed.2d 412 (1962); *Edynak v. Atlantic Shipping Inc. Cie. Chambon Maclovia S.A.,* 562

F.2d 215, 224–25 & n. 13 (3d Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).[5] We need not ponder whether either of these neoteric theories— too few in crew, use of an improper method—find meaningful support in the record. Assuming them to be legally cognizable, the plain fact of the matter is that afterthoughts such as these cannot be surfaced for the first time on appeal.

In the absence of extraordinary circumstances, none of which are apparent here, we have regularly declined to consider points which were not seasonably advanced below. *Whyte v. Connecticut Mut. Life Ins. Co.,* 818 F.2d 1005, 1009–10 & nn. 5–7 (1st Cir.1987); *United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 760 (1st Cir.1985); *Jones v. City of Somerville,* 735 F.2d 5, 7 (1st Cir.1984); *Cohen v. President and Fellows of Harvard College,* 729 F.2d 59, 60–61 (1st Cir.) (per curiam), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979). This litigation presents no occasion to retreat from that prudential stand. Accordingly, we abjure

consideration of Clauson's newfound theories of the case—theories which, we note, the defendant had no opportunity to meet at trial and the district judge, sitting as the factfinder in this bench trial, had no cause to examine. Having steamed into, and out of, the trial court under the flag of the dilapidated idler, and having been denied safe harbor there, it is too late in the day for Clauson to put into an appellate port flying fresh, untested colors.

### IV

We conclude that the district court successfully navigated the coral reefs and jagged shoals of this litigation. We can discern no clear error in any of the court's pivotal findings: that Smith was not estopped to raise a limitations defense, that Clauson's Jones Act initiative was time-barred, and that the unseaworthiness claim remained unproven.[6] Accordingly, the appellant's voyage to our shores profits him naught.

*Affirmed.*

---

5. We express no opinion as to whether the "improper method" cases can extend beyond the loading and unloading context, or whether retrieval of fishing nets aboard a trawler comprises "loading." For the reasons mentioned in the text, this case does not require us to reach those questions.

6. The district court elected first to consider the merits of Count II. Finding no liability, it never reached the question of whether the unseaworthiness claim, like the Jones Act claim, was outlawed by the belatedness of the suit. That problem is complicated because of uncertainty—which we need not address—as to whether the equitable doctrine of laches or the provi-

sions of 46 U.S.C. § 763a, enacted October 6, 1980 (after Clauson's injury occurred), would govern such a question on the facts of this case. *Compare Fordham v. Belcher Towing Co.,* 710 F.2d 709, 710–11 (11th Cir.1983) (per curiam) (law of laches applies; § 763a cannot cut off claims which accrued before its enactment) *with Cooper v. Diamond M Co.,* 799 F.2d 176, 178 & n. 2 (5th Cir.1986) (holding *contra*), *cert. denied,* — U.S. —, 107 S.Ct. 2177, 95 L.Ed. 834 (1987). Inasmuch as we, like the district court, find the merits to be dispositive, we stop short of considering Smith's other defenses and express no opinion on the temporal attributes of Count II.

APPENDIX 1

APPENDIX II

HANGING BLOCK

TOW WIRE

SWIVEL

FLAT LINK

"C" HOOK

IDLER CHAIN

DOOR

BACK STRAPS

KELLY EYE

STOPPER