**Richard and Anita POLIQUIN,
Plaintiffs–Appellants,**

v.

**GARDEN WAY, INC., Defendant–
Appellee.**

Nos. 92–1115, 92–1116.

United States Court of Appeals,
First Circuit.

Heard July 29, 1992.

Decided March 24, 1993.

Rehearing Denied April 20, 1993.

Maurice A. Libner with whom Marcia J. Cleveland and McTeague, Higbee, Libner, MacAdam, Case and Watson, Topsham, ME, were on brief, for plaintiffs-appellants.

Cheryl Flax–Davidson, San Juan, PR, and Bob Gibbins, Austin, TX, were on brief, for amicus curiae The Ass'n of Trial Lawyers of America.

Mark L. Austrian with whom Collier, Shannon, Rill & Scott, Washington, DC, Roy E. Thompson, Jr., Glenn H. Robinson, and Thompson & Bowie, Portland, ME, were on brief, for defendant-appellee.

James D. Poliquin, Russell B. Pierce, Jr. and Norman, Hanson & DeTroy, Portland, ME, were on brief, for amicus curiae The Defense Research Institute, Inc.

Before TORRUELLA and BOUDIN, Circuit Judges, and KEETON,* District Judge.

BOUDIN, Circuit Judge.

Richard and Anita Poliquin, appellants in this court and plaintiffs below, challenge protective orders of the district court limiting access to certain discovery materials in this case. The plaintiffs' underlying product liability claim has been settled. The discovery dispute lives on, consuming the time and energy of the courts, largely as a contest between plaintiffs' counsel and the defendant-appellee, Garden Way, Inc. For reasons set forth below, we modify the orders under review in one important respect and otherwise affirm.

## I. PROCEEDINGS IN THE DISTRICT COURT

In October 1990, Richard Poliquin was seriously injured while operating the Super Tomahawk, a chipper/shredder manufactured by Garden Way. He and his wife brought suit against Garden Way in the district court, charging that the injury was due to the defective design of the product. The Poliquins sought discovery from Garden Way including design specifications, sales data and information about other accidents involving the Super Tomahawk or similar equipment.

In response, Garden Way sought a protective order limiting disclosure of answers and documents produced in response to

specified discovery requests. The Poliquins resisted. Garden Way submitted an affidavit from its general counsel Lucia Miller in support of its request. On August 2, 1991, after a hearing on discovery issues, a protective order was entered by the magistrate judge to whom discovery matters had been assigned. The protective order said that Garden Way did have "valuable trade secrets and other confidential information" which were sought in discovery but should not be made public. The order afforded confidential treatment to information obtained through some, but not all, of the interrogatories specified by Garden Way, and to other information that had been the subject of the hearing.

The August 2 order also created a mechanism for resolving disputes about new discovery. It provided that if Garden Way produced other information or documents that it deemed confidential, it should mark them with a legend showing that they were "confidential" pursuant to court order in the case. If the Poliquins disagreed, they could contest the designation by motion within a fixed period, effectively 15 days from the production of the materials. The order provided that it "shall not terminate at the conclusion of this action" and within 90 days after the conclusion, all information and documents subject to the order "shall be destroyed" and a certificate of destruction provided by counsel.

The Poliquins appealed the August 2 order to the district judge who affirmed it as "not clearly erroneous." An appeal to this court was taken but dismissed as interlocutory. The interrogatory answers and documents provided by Garden Way under the protective order listed the names of other persons who had been injured by Garden Way equipment and included a number of complaints such persons had filed in other suits. The Poliquins later took depositions (under Fed.R.Civ.P. 31) of 23 other individuals who had suffered such accidents, as well as the videotaped deposition of Jay Sluiter, a former employee of Garden Way. The protective order provided that confidential information within a deposition

* Of the District of Massachusetts, sitting by designation.

transcript was to be designated by underlining the lines in question and stamping the pages "confidential." It is not clear that Garden Way did so in each instance.

A pretrial hearing occurred on October 24, 1991. The district judge ruled that the Poliquins were free to offer information and documents at trial even if they had been designated as confidential during discovery. During this colloquy, plaintiffs' counsel suggested that material offered in evidence would be freed from further restriction, so he could send such material to other plaintiffs who had similar cases. Defense counsel disagreed and concluded by saying that when trial is over "I will request that those exhibits be returned." The court replied: "Correct.... When the trial is over, whatever rights you have ... to control the further dissemination of the material, you can invoke."

Trial began on October 28, 1991. During trial, the court permitted the Poliquins' counsel to read to the jury a portion of Garden Way's interrogatory answers—relating to certain of the other accidents involving Garden Way equipment—but it did not allow the written interrogatory answers themselves to be offered as exhibits and excluded information about many of the other accidents altogether. None of the Rule 31 depositions of other injured persons was admitted or read to the jury, the court excluding them as prejudicial and of little value. A videotape of the Sluiter deposition was shown to the jury in its entirety.

During trial, the parties agreed to settle the case, and the jury was discharged. Thereafter, on November 13, 1991, defense counsel wrote to the Poliquins' counsel listing 214 items claimed to be covered by the protective order, and requesting that the listed material be returned or destroyed. Some of the 214 items had not previously been designated as confidential. Included in the list were portions of the trial record. It appears that the Poliquins' counsel did not immediately reply.

On November 18, 1991, plaintiffs executed a "release and indemnity agreement" and received a check. The agreement stated that "[r]eleasors and their attorney acknowledge that they are still bound by the terms of the [August 2] Protective Order" as to disclosure of protected materials. In a signed addendum, the Poliquins' counsel approved the agreement and "acknowledge[d] continuing applicability of the Protective Order and agree[d] to comply with the portions of this agreement which apply to him." The counsel "further agree[d]" that he would instruct any expert or consultant shown confidential material not to disseminate it and to return all documents or other written materials to defense counsel. On November 27, 1991, the district court formally dismissed the case.

Shortly before the dismissal, the Poliquins on November 25, 1991, filed a motion "for determination of confidentiality" asking the court to rule that a number of items listed in the November 13, 1991, letter were not subject to any confidentiality restriction. The Poliquins argued that their counsel had independently learned the names of seven injury victims before the interrogatories were answered; that any information admitted into evidence at trial, (*e.g.*, the Sluiter deposition) should not be protected; that it would be wasteful of resources to protect the unadmitted Rule 31 depositions of victims; and that court complaints filed in other cases, although furnished by Garden Way in discovery and not admitted at trial, were public documents.

Garden Way opposed the motion and asked the court to seal *pendente lite* confidential material to the extent contained in the court's file. By endorsements, the district judge on December 10, 1991, granted Garden Way's request and denied the Poliquins' motion. Then, on January 17, 1992, the district court on further review of Garden Way's request directed that material subject to the August 2 protective order be removed from the court file by counsel for Garden Way and the court then sealed "all testimony and arguments made during the trial dealing with the matters which are subject to" the August 2 order, unless and until otherwise ordered by the court.

The Poliquins appealed to this court both the December 10, 1991, order denying its motion and the January 17, 1992, order sealing in part the trial record. An amicus brief supporting them has been filed by the Association of Trial Lawyers of America and another in opposition by the Defense Research Institute, Inc. There is no hint that the Poliquins themselves have any practical interest in the outcome of the appeal, but as they are formally subject to protective orders entered in their case, we see no lack of standing to seek appellate review.

## II. THRESHOLD ISSUES

■ At the outset, we face arguments on both sides that important issues have been waived or relinquished. To raise an issue on appeal, a litigant must generally show the issue was raised in the trial court by a proper request or objection and that the right ground for the request or objection was given at the time. *See generally Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (collecting waiver cases). Even then, a mistake in the ruling will be disregarded unless prejudice resulted from the error. *E.g.,* Fed.R.Evid. 103(a). Finally, nothing prevents a party from consenting by stipulation or contract not to pursue a specific issue on appellate review.

The reason for the rules is not that litigation is a game, like golf, with arbitrary rules to test the skill of the players. Rather, litigation is a "winnowing process," *Howell v. Federal Deposit Ins. Corp.,* 986 F.2d 569, 575 (1st Cir.1993), and the procedures for preserving or waiving issues are part of the machinery by which courts narrow what remains to be decided. If lawyers could pursue on appeal issues not properly raised below, there would be little incentive to get it right the first time and no end of retrials. Thus, while there are escape hatches—"plain error," "miscarriage of justice," and other rubrics—an argument not properly preserved in the trial court is normally unavailable on appeal.

Garden Way argues that in the release the Poliquins agreed to be "bound" by the August 2 protective order, and so have relinquished their right to challenge the protective order on appeal. The argument may have more force as to some of the information in dispute (*e.g.*, the answers to specifically protected interrogatories) and less as to other items (anything arguably "added" by Garden Way's post-trial letter to previously protected information). But we need not resolve the matter because Garden Way made no such relinquishment argument to the district court when it opposed the Poliquins' motion to determine confidentiality.

■ Although appellate courts have discretion to resolve issues waived or abandoned at trial, *Clauson*, 823 F.2d at 666, this is and should be uncommon, especially where facts pertinent to the issue are not in the record. Here, the import of the release is less clear than Garden Way suggests. The release states that the Poliquins are "still bound by the terms" of the August 2 protective order, but it is open to argument whether "the terms" apply to all of the disputed material. The parties' intentions might be illuminated by facts incident to the negotiations, but those facts are absent. In all events, we conclude that Garden Way has itself waived the right to argue that the release bars this appeal.

■ Garden Way next argues that the Poliquins cannot attack the protective order because they failed to file an affidavit of their own in opposition to the original request for that order. We think it plain that the Poliquins, having made and pursued a timely objection to the August 2 order, are free to argue that the order was itself unlawful *ab initio*. The burden of showing cause for the order was upon Garden Way and the Poliquins can argue that the burden was not met (or that the order was overbroad) without offering affidavits of their own.

■ Finally, turning the tables, the Poliquins themselves contend that Garden Way lost the protection of the August 2 order as to various depositions because they were not marked "confidential" and underlined as required by the order. Garden Way says in reply that some depositions were

not received until the midst of trial, delaying the designation process. The facts are obscure but need not be determined. The Poliquins' waiver argument was not made in their motion for a determination of confidentiality or the supporting memorandum. Accordingly, this fact-bound argument is itself unavailable on appeal.

## III. THE MERITS

■ *The August 2 Order.* Protective orders of various kinds are employed in civil cases, ranging from true blanket orders (everything is tentatively protected until otherwise ordered) to very narrow ones limiting access only to specific information after a specific finding of need. *See generally* Francis H. Hare, Jr., James L. Gilbert & William H. ReMine, *Confidentiality Orders,* § 4.10 (1988). The magistrate judge's order in this case fell between these poles: it was based on an affidavit cast in broad terms; it protected specific interrogatory answers; and it set up a mechanism allowing Garden Way to designate further confidential material subject to objection by the Poliquins.

District judges need wide latitude in designing protective orders, and the Federal Rules of Civil Procedure reflect that approach. Rule 26(c) generously permits "for good cause shown" the making of "any order which justice requires" to protect against annoyance, embarrassment or undue burden occasioned by discovery. The district court has "broad discretion" to decide "when a protective order is appropriate and what degree of protection is required," *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984), and great deference is shown to the district judge in framing and administering such orders. *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); 8 Charles A. Wright & Arthur R. Miller, *Fed-*

*eral Practice and Procedure* § 2036 (1970).

Here, we have no doubt that the magistrate judge was entitled to enter the August 2 order. Some trial judges take a stricter view of the showing needed to protect discovery. But, in coping with the torrent of material often discovered but never used at trial, other judges require some general showing by affidavit and then protect materials designated by one side, subject to challenge by the other. Apart from a few aspersions on the Garden Way affidavit, the Poliquins do not seriously renew their prior attack on the original August 2 order. To the extent they do so, we reject that claim, finding the Miller affidavit adequate to support the original protective order.

This conclusion, however, does not even begin to dispose of the case. The Poliquins' main attack is directed not to the August 2 order of the magistrate judge but to the protection afforded or reaffirmed under the district judge's own ancillary orders of December 10, 1990, and January 17, 1991. These orders rejected the Poliquins' request to release (1) the Sluiter deposition and certain excerpts from interrogatory answers (read into evidence at trial) relating to other accidents, (2) court complaints filed by certain victims (which were not admitted at trial), and (3) and the Rule 31 depositions of victims (which likewise were not admitted at trial).[1]

■ *Admitted Evidence.* Among the items protected by the district court's orders are materials that were actually admitted into evidence at trial: the videotape of the Sluiter deposition and excerpts read into the record from interrogatory answers describing other accidents. There is no issue of waiver here, for (as earlier noted) Garden Way made clear its desire to enforce the protective order even for material admitted at trial, and the district court

---

1. These latter orders were issued after the dismissal of the case, and under *Public Citizen,* 858 F.2d at 781–82, the district court could not after dismissal expand the protective order to create new obligations. Examining this "jurisdictional" issue *sua sponte,* we find that the orders in

question represent in part a declaration of the scope of the existing August 2 order as applied to disputed materials and in part a refusal to remove prior protection. Thus, the orders were within the district court's continuing authority over previously issued orders.

reserved decision on the matter. We conclude, however, that only the most compelling showing can justify post-trial restriction on disclosure of testimony or documents actually introduced at trial. That showing has not been made in this case.

■ We have no doubt that, in rare circumstances, material introduced at trial can be safeguarded against disclosure afterwards. *See Anderson v. Cryovac, Inc.,* 805 F.2d 1, 11–12 (1st Cir.1986). Material of many different kinds may enter the trial record in various ways and be considered by the judge or jury for various purposes. The subject could be national security, the formula for Coca Cola, or embarrassing details of private life. The evidence might be offered only at the bench and the transcript immediately sealed, or it might be provided in a closed hearing, or it might be offered in public but be hard to replicate without a transcript. It is neither wise nor needful for this court to fashion a rulebook to govern the range of possibilities.

■ One generalization, however, is safe: the ordinary showing of good cause which is adequate to protect *discovery material* from disclosure cannot alone justify protecting such material after it has been introduced at trial. This dividing line may in some measure be an arbitrary one, but it accords with long-settled practice in this country separating the presumptively private phase of litigation from the presumptively public. *See Cowley v. Pulsifer,* 137 Mass. 392 (1884) (Holmes, J.). Open trials protect not only the rights of individuals, but also the confidence of the public that justice is being done by its courts in all matters, civil as well as criminal. *See Seattle Times Co.,* 467 U.S. at 33, 104 S.Ct. at 2207–08 (distinguishing discovery material, traditionally not available to the public, from trial evidence which normally is available).

There is thus an abiding presumption of access to trial records and ample reason to "distinguish materials submitted into evidence from the raw fruits of discovery." *Littlejohn v. BIC Corp.,* 851 F.2d 673, 678, 684 & n. 28 (3d Cir.1988). As we have said elsewhere, "'[o]nly the most compelling reasons can justify the non-disclosure of judicial records.'" *FTC v. Standard Financial Management Corp.,* 830 F.2d 404, 410 (1st Cir.1987) (quoting *In re Knoxville News–Sentinal Co.,* 723 F.2d 470, 476 (6th Cir.1983)). *Accord, Joy v. North,* 692 F.2d 880, 893–94 (2d Cir.1982). In this case, there are no separate findings by the district court explaining the need for post-trial protection of trial evidence. While in some cases "compelling reasons" might be apparent from the record, that is not so here.

■ Considering first the description of other accidents in the interrogatory responses, we believe no basis exists for a finding of "compelling reasons." Garden Way's reason for protection of such incidents is set forth in the Miller affidavit. It amounts to a garden-variety claim that the company's image among customers will be damaged through the misuse or distortion of those accident claims. In our view, this threat may be adequate as a ground for protecting discovery material;[2] but it is outweighed, after the material is introduced in evidence, by the public's interest in access to trial records. *See Littlejohn,* 851 F.2d at 685.

Trials after all commonly generate bad publicity for defendants. Specific pieces of evidence are only details of a larger picture, often a very disparaging one, created by reports of the case in the press. This publicity may be unfair or distorted, but the injury is the price paid for open trials. At least in the absence of extraordinary circumstances, commercial embarrassment is not a "compelling reason" to seal a trial record. We have examined the interrogatory answer excerpts at issue in this case and find nothing to alter our judgment.

■ The videotape of the Sluiter deposition presents a different problem because Garden Way, in arguing about its confiden-

---

**2.** Some courts have questioned whether corporate reputation warrants protection at all under Rule 26, *e.g., Smith v. BIC Corp.,* 869 F.2d 194 (3d Cir.1989). In our view, so long as the protective order permits the opposing litigant to reach the material—and use it as needed at trial—it is hard to see why the district court should not be allowed to safeguard reputation.

tiality, made a proffer which goes somewhat beyond claims of embarrassment. Garden Way said that the deposition

> deal[s] with the internal procedures by which Garden Way evaluates a product, market tests products and ultimately purchases the product for incorporation into its product line. [Sluiter's] testimony and exhibits deal with Garden Way's specific business plan for shredders, business plans for other types of power equipment, as well as customer profile information. All this information is highly confidential and proprietary....

Needless to say, these assertions, no matter how accurate, could not provide a basis for protecting the *entire* videotape of the deposition after its introduction into evidence, but at most only trade secret or like material of unusual importance.

In any event, we see no need for a remand to consider any splicing of the tape. After reviewing the deposition transcript, this court finds that the videotape contains nothing remotely comparable to, say, the formula for Coca Cola or even an important trade secret. Garden Way's business methods are discussed but there are no startling revelations. The disadvantages of disclosure relate to future litigation, not the conduct of Garden Way's business. There is no "compelling reason" here to restrict access to a videotape already played in open court.

■■■ We note that a litigant like Garden Way has a straightforward *trial* remedy, one apparently not used in this case. At the time that confidential information is offered in evidence, the trial judge has ample power to exclude those portions that have limited relevance but contain trade secrets or other highly sensitive information. Fed.R.Evid. 403. This approach will not solve every problem but, to the extent it applies, it can mitigate harm without any impairment of public access to the trial record.

*Public Records.* The Poliquins next object to the protection after trial of copies of civil complaints filed in other courts against Garden Way by other accident victims in other cases. None of these complaints was accepted in evidence at trial. Nor do we understand the Poliquins to claim that their attorney obtained the complaints independently of discovery.[3] The issue, then, is whether the character of the complaints as public records means that "good cause" cannot exist for protecting them under Rule 26 even though they were obtained by compulsory discovery from the party seeking protection.

■■■ At first blush, it might appear odd to safeguard with a protective order "public" documents that anyone in the country can secure by visiting a government office and using the copying machine. Yet, one can easily imagine "public" archival material where difficulties of discovery and assembly represent a significant investment by the original finder and a barrier to easy replication. Indeed, most "trade secrets" are duplicable with enough time and effort. The futility of protecting a "public" document might persuade a court to deny protection. But we see no basis for a blanket rule forbidding Rule 26 protection in all instances where the "public" document is obtained through discovery under an otherwise justified protective order.

The "public" character of the complaints is the only reason given by the Poliquins for ordering their disclosure. We therefore have no reason to consider whether the magistrate judge's original inclusion of the complaints under the protective order was error for any other reasons. A protective order may often specify categories of information for protection without document by document review, and the design of the order is in any event largely within the trial court's discretion.

---

**3.** Their attorney asserts that he obtained the names of seven victims independently but then secured the complaints they had filed from Garden Way through compulsory discovery. In our view this makes the complaints themselves discovered material. Limiting use of independent-

ly obtained material would, of course, raise serious questions as to the scope of the court's authority and under the First Amendment. *See Seattle Times,* 467 U.S. at 37, 104 S.Ct. at 2209–10; *International Products Corp. v. Koons,* 325 F.2d 403, 409 (2d Cir.1963) (Friendly, J.).

■ *The Rule 31 Depositions.* The remaining documents in dispute are the Rule 31 depositions of 23 accident victims not admitted into evidence at trial. The issue before us is narrow. The Poliquins, as we have said, have waived any claim that protection for the depositions was not timely sought. Nor do the Poliquins assert that the depositions must be disclosed in order to advise the public, and especially the authorities, of an unknown danger. *Cf. Anderson v. Cryovac, Inc.*, 805 F.2d at 8 (permitting plaintiffs to disclose to government authorities discovery information regarding toxic chemicals in the city's water supply). In this case, nothing prevents the Poliquins from advising the government of their claim that the Super Tomahawk is defective.

The Poliquins argue instead that disclosure of the depositions is warranted to avoid wasteful duplication of discovery in other cases.[4] The argument has a surface appeal in a time of swollen litigation cost and crowded dockets, but it looks at only one element in the equation. Absent an immediate threat to public health or safety, the first concern of the court is with the resolution of the case at hand. Judges have found in many cases that effective discovery, with a minimum of disputes, is achieved by affording relatively generous protection to discovery material. Impairing this process has immediate costs, including the delay of discovery and the cost to the parties and the court of resolving objections that would not be made if a protective order were allowed.

■ For these reasons, the district court under current law retains broad discretion to protect discovery material, despite the burden of re-discovery imposed on future litigants in future cases. There have been proposals in Congress for "sunshine" legislation to provide public access to discovery, *Court Secrecy: Hearings Before the Subcomm. on Courts and Administrative Procedure of the Senate Ju-*

*diciary Committee*, 100th Cong., 1st Sess. (1990), but there has also been strong opposition to these proposals and few states have adopted them. *See, e.g.,* Judicial Conf. of the United States, *Report of the Federal Courts Study Committee* 102–03 (1990); Arthur Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv.L.Rev. 427, 477–502 (1991). In all events, Congress has not altered the law.

■ Where the district court does protect material during discovery, it is common to provide, as the magistrate judge did here, for post-trial protection including the return or destruction of protected material. In most cases, the lubricating effects of the protective order on pre-trial discovery would be lost if the order expired at the end of the case or were subject to ready alteration. *See* Miller, *supra,* at 499–500. Nevertheless, a protective order, like any ongoing injunction, is always subject to the inherent power of the district court to relax or terminate the order, even after judgment. *Public Citizen,* 858 F.2d at 781–82.

This retained power in the court to alter its own ongoing directives provides a safety valve for public interest concerns, changed circumstances or any other basis that may reasonably be offered for later adjustment. Where such a request is made to the district judge and an appeal thereafter follows, the standard of review broadly speaking is abuse of discretion. *Id.* at 790–92. Nothing in this case suggests that the district court abused its discretion in refusing to lift the protective order for discovery materials not introduced at trial.

The orders of the district court under review are *modified* to exclude from their scope the videotape of the Sluiter deposition and the interrogatory answer excerpts to the extent read into evidence, and the district court's orders are otherwise *affirmed.* No costs.

---

4. The Poliquins' counsel also argues that he has invested $5,000 in taking the depositions and should be free to recoup his costs by using the depositions in other suits against Garden Way. This version of events overlooks the fact that counsel was not doing private research but was using the court's compulsory process to secure the information from deponents compelled to attend and answer.

**536**

KEETON, District Judge (Dissenting).

I respectfully dissent on the ground that this court is without jurisdiction to hear this appeal, and, in the alternative, that the most we have jurisdiction to do, and should do, is to vacate aspects of the district court orders that were beyond the district court's jurisdiction.

## I. *Jurisdiction Over the Appeal*

The briefs filed in this case by counsel for the named parties present issues of fundamental significance concerning the nature and scope of protective orders issued by district courts during pretrial proceedings and concerning settlements on *terms that leave such orders in effect.* *Amicus* briefs (filed on behalf of separate associations of attorneys who commonly represent plaintiffs and defendants respectively in product liability actions) reflect widespread interest in the bar.

The importance of the issues underscores the importance of this court's sensitivity to limits on its jurisdiction. I recognize how pressing are the interests of the bar and trial judges in having clear guidance about important unsettled issues that are confronted almost daily in the district courts. At least equally compelling, however, are the interests underlying limits on our jurisdictional authority. We must respect constitutional constraints against issuing advisory opinions when no live case or controversy is presented to the court by real parties in interest.

## A. Interest of the Poliquins

As noted in Part I of the Court's Opinion, the Poliquins, nominally the appellants in this case, received a check from Garden Way and executed a "release and indemnity agreement" that included a provision declaring that "[r]eleasors and their attorney acknowledge that they are still bound by the terms of the [August 2] Protective Order" as to disclosure of protected materials. The record before us strongly suggests that Garden Way may have been influenced to make a higher cash offer for this settlement than would have been made in return for a release that did not include

the provision binding the Poliquins and their attorney by the terms of the protective order. Also, viewed in the light most favorable to an argument that the Poliquins have a legally protected interest at stake in this appeal, the record fails to show that they have any tangible interest in the outcome of this appeal (if indeed it does not strongly suggest the contrary). Also, again viewing matters most favorably to an argument that the Poliquins have an interest, one may doubt that whatever intangible interest they have in the outcome of this appeal is a legally protected interest.

The fact that the Poliquins are named as people subject to an ongoing protective order does not demonstrate that they have a legally protected interest in challenging that order. To whatever extent the interlocutory protective order survives after final judgment (dismissing the action after the parties reported their settlement), it survives as a "protective order" of the court—or perhaps more accurately stated, as protective terms of a settlement agreement—only because the Poliquins and their attorney agreed to it.

The Poliquins, and the attorney who represented them in effecting the settlement, are barred by contract from challenging the terms of the order or the settlement agreement incorporating those terms. I conclude also that, by reason of this bar, the Poliquins lack the kind of interest that would give them standing in this court (or in the district court, *see* Part II below) to challenge the very terms of the "protective order" to which they had agreed in settling the case.

The rule that a party who settles a case cannot thereafter appeal a court order entered previously in that case is confirmed in precedent and is comprehensive in scope. Any case or controversy previously existing between the parties is moot after complete settlement. *See Lake Coal Co. v. Roberts & Schaefer Co.,* 474 U.S. 120, 106 S.Ct. 553, 88 L.Ed.2d 418 (1985) (per curiam). Although partial settlement does not necessarily bar appeal of unsettled disputes, *see Nixon v. Fitzgerald,* 457 U.S.

731, 743–44, 102 S.Ct. 2690, 2697–98, 73 L.Ed.2d 349 (1982) (case not moot after agreement fixing damages dependent on outcome of appeal), when a party enters into an agreement encompassing a specific issue, no live case or controversy exists over that issue. *See* 13A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 3533.2 at 234 ("A partial settlement moots the issues involved in the settlement, but not those that the parties did not intend to settle."). One context in which appeals have been dismissed concerns appeal of a trial court order of remittitur. Even when a plaintiff agrees to a remittitur "under protest" and purports to reserve a "right to appeal therefrom," the plaintiff "may not appeal from a remittitur order he has accepted." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam) (affirming circuit court's dismissal of appeal).

Here, the settlement agreement purported to settle the entire controversy, and the Poliquins specifically agreed to abide by the terms of the protective order. Any legal controversy between Garden Way and the Poliquins over the propriety of the protective order, therefore, is moot.

Because the legal controversy over the protective order was rendered moot by the settlement, we should not decide the important issues argued before us, whether or not the parties waived any jurisdictional impediment. *See DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974) (per curiam) (determining that in federal courts, a case is not saved from mootness by "great public interest in the continuing issues" even if that circumstance might permit jurisdiction in a state's legal system). Resolution of any dispute over the protective order should be resolved under contract principles, and not the (moot) legal controversies addressed by the opinion of the Court in this case. *See* 13A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 3533.2 at 233–34 ("[Q]uestions arising out of settlements, [as well as] mootness questions should be answered according to the [manifested] intent of the parties and more general contract principles.").

**B. Interest of the Poliquins' Attorney**

Any interest the Poliquins' attorney may have in challenging the terms that both the Poliquins and he agreed to as part of the settlement cannot properly be asserted in this appeal as an interest of the Poliquins. Indeed, any suggestion to the contrary is troubling not only because of its inconsistency with precedents, to be considered below, but also because it raises a problem of potential conflict of interest between the Poliquins and their attorney.

A party defendant may be willing to offer more cash, and a party plaintiff may be willing to accept it, on condition that the terms of a protective order remain in force after the settlement. An attorney, on the other hand, might naturally be more or less resistant to such an agreement than the client. The potential conflict might affect the attorney-client relationship both during settlement negotiations and in further proceedings before the court after the final judgment of dismissal. In post-settlement proceedings in this case, of course, the opposing attorneys were formally appearing not each in his own right but each for his client or clients.

**C. Real–Party–in–Interest and Constitutional Requirements**

Federal Rule of Civil Procedure 17 requires that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). It may be debatable whether this rule applies to proceedings in a court of appeals. *See* Fed.R.Civ.P. 1 ("These rules govern the procedure in the United States district courts ... with the exceptions stated in Rule 81."). *See also* Fed.R.Civ.P. 81 (containing no specific provision regarding applicability to proceedings in a court of appeals). Something akin to a real-party-in-interest requirement nevertheless applies to appeals because of the constitutional requirement of a case or controversy. *See Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (appellant pediatrician did not have a judicially cognizable interest in

defending Illinois criminal statutes; only the State did, and it did not appeal; appeal dismissed). *See also Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137–38, 119 L.Ed.2d 351 (1992) (the "injury in fact" test requires both injury to a cognizable interest and a showing that the party seeking review is among the injured and would be "directly" affected by challenged action) (citations omitted).

Moreover, the Federal Rules of Appellate Procedure contain a requirement that a "notice of appeal shall specify the party or parties taking the appeal," Fed.R.App.P. 3(c), and this requirement has been rigorously enforced. A court of appeals is without jurisdiction to hear an appeal on behalf of a person who has not been specified in the notice of appeal as a party taking the appeal. *See Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Santos–Martinez v. Soto–Santiago,* 863 F.2d 174 (1st Cir.1988). This court has dismissed an appeal that an attorney sought to press to decision after the attorney's clients had settled all interests they had in the appeal. *Pontarelli v. Stone,* 978 F.2d 773 (1st Cir.1992).

### D. Conclusion

In view of the likelihood, suggested by the record, that the only named appellants have no legally protected interest at stake in this appeal, I conclude that we should dismiss this appeal unless, within thirty days from this date, a submission is filed with this court showing a factual and legal basis for a determination that the named appellants have a legally protected interest that would be affected by the outcome of this appeal.

### II. *Jurisdiction of the District Court*

In view of the rejection of my position that we should dismiss the appeal in this case for want of appellate jurisdiction, I turn next to considering limits upon the district court's jurisdiction and the effect of those limits upon the jurisdiction of this court.

Once this court determines that it has jurisdiction of this appeal for any purpose, I do not question that the court should at least exercise jurisdiction to consider whether the district court erred in making an order in excess of its jurisdiction. This court's jurisdiction may be limited, however, to authority to vacate any aspect of the orders of the district court that the district court lacked jurisdiction to make.

If the district court, in either of its orders appealed from (the December 10, 1991 and January 17, 1992 orders) made an order on the merits (for example, expanding or narrowing the scope of the magistrate judge's August 2 order), it erred. The district court lacked jurisdiction to enter such an order in a closed case (a final judgment of dismissal, by reason of a settlement between the parties, having been entered). *See* Part I.A, above. The district court's error in this respect cannot confer jurisdiction on the court of appeals to reverse in part and affirm in part, thereby making a different order on the merits; instead, our jurisdiction is limited to ordering that, insofar as the district court orders appealed from purported to expand or otherwise modify the August 2 order, they be vacated for lack of jurisdiction of the district court to make such orders.

Just as I believe it imperative that this court be sensitive to limits on its jurisdiction over an appeal in the name of the Poliquins if they are no longer real parties in interest (for reasons explained in Part I.C, above), I believe it imperative also that this court be sensitive to limits on the jurisdiction of the district court to act on a motion made on behalf of the Poliquins in that court if, before the motion was filed, the Poliquins had ceased to be real parties in interest. The fact they are formally named as subject to the terms of the "protective order" is not enough to give them either a practical interest or a legally protected interest to support their motion seeking a modification of a "protective order" to which they agreed as part of the settlement.

In the district court, Federal Rule of Civil Procedure 17 was applicable without doubt. Also, the district court was under the same constitutional constraints as this

court with respect to the jurisdictional necessity of a live case or controversy between the parties (the Poliquins) by whom the motion was brought and the party (Garden Way) against which relief was sought.

A summary of the history of the protective order includes these steps:

August 2, 1991. The magistrate judge made the Protective Order at Garden Way's request and over the Poliquins' opposition. The Poliquins appealed this order to the district judge, who affirmed it as not "clearly erroneous." An appeal to the court of appeals was dismissed because the order was interlocutory.

October 24, 1991. During a pretrial hearing, in response to a suggestion by plaintiff's attorney that he be free from any restriction against disclosure of material offered in evidence at trial, defendant's attorney disagreed and stated, "I will request that those exhibits be returned." The district court replied: "Correct.... When the trial is over, whatever rights you have ... to control the further dissemination of the material, you can invoke."

November 4, 1991. [This date is indicated in Defendant's Memorandum in Opposition to Plaintiffs' Motion for Determination of Confidentiality at 1 (seven days after trial commenced on October 28, 1991).] On this date, during trial, the parties reported to the district court that they had settled. The court discharged the jury.

November 13, 1991. Defense counsel wrote to plaintiffs' counsel listing 214 items claimed to be covered by the Protective Order and requesting that the listed material be returned or destroyed. Some of these items had not previously been designated as confidential. This letter appears not to have been delivered to the court at that time, but apparently it was brought to the court's attention through the Poliquins' motion of November 25, 1991.

November 18, 1991. The Poliquins executed a "release and indemnity agreement" and received a check. The agreement stated that "[r]eleasors and their attorney acknowledge that they are still bound by the terms of the Protective Order" as to disclosure of protected materials. In an addendum, plaintiffs' attorney signed an acknowledgement that the agreement was binding on him.

November 25, 1991. Two days before entry of the final judgment of dismissal and seven days after executing the "release and indemnity agreement," the Poliquins filed a motion "for determination of confidentiality".

November 27, 1991. The clerk entered a final judgment of dismissal of the action. That final judgment made no reference to the terms of the protective order, either in its August 2nd form or as it may have been interpreted or modified by the district court's oral ruling in the pretrial hearing of October 24, 1991.

December 5, 1991. Defense counsel sent to plaintiffs' counsel and the court a letter, later treated by the court as defendant's Motion to Seal Documentation from its File Until Parties Come to An Agreement.

December 9, 1991. Defendant filed a written memorandum in opposition to the Poliquins' motion of November 25.

December 10, 1991. The clerk sent the following notice to all counsel:

Please take notice that Chief Judge Gene Carter has this date made the following endorsements on the motions listed below:

(1) *Plaintiffs' Motion for Determination of Confidentiality:* "12/10/91 MOTION DENIED".

(2) *Defendant's Motion to Seal Documentation from its File until Parties Come to An Agreement* (Letter addressed to William Brownell dated December 5, 1991 from Roy E. Thompson): "12/10/91 MOTION GRANTED; Counsel to file a proposed final order within ten (10) days".

Addendum to Appellants' Brief at 1.

January 17, 1992. The court signed and the clerk entered an "Order on Defendant's Motion to Seal Documentation" as follows:

After reviewing Garden Way Incorporated's request to seal all confidential information contained in the Court's file,

it is hereby ordered that all such documentation may be removed from the Court's file by counsel for Garden Way Incorporated. The documentation which is to be removed is subject to this Court's Protective Order dated August 2, 1991. In addition the Court will seal all testimony and arguments made during the trial dealing with matters which are subject to said Protective Order, and any sealed material shall not be reviewed except upon order of this Court.

*Id.* at 2.

The Poliquins filed notices of appeal from the December 10, 1991 and January 17, 1992 orders.

It is true that Garden Way's Memorandum in Opposition to Plaintiffs' Motion for Determination of Confidentiality does not argue that the district court lacks jurisdiction to grant plaintiffs' motion. Instead, it argues that the district court should deny plaintiffs' motion because, after the litigation has

been settled, the case dismissed and Plaintiffs paid, Plaintiffs' counsel seeks an order from this Court essentially reversing the Protective Order, thereby permitting counsel for the Plaintiffs to disseminate this protected information on a nationwide basis.

Defendant's Memorandum in Opposition to Plaintiffs' Motion for Determination of Confidentiality, 12/9/91, quoted in Addendum to Reply Brief of Appellants, at 17.

It is true also that defendant's counsel, too, after the settlement, in effect sought a modification of the protective order. First, the letter of November 13, 1991, addressed to plaintiffs' counsel, listed 214 items claimed to be covered by the protective order and requested that the listed material be returned or destroyed. The record does not disclose that this request was made to the court, but apparently it was brought to the court's attention by plaintiffs' motion of November 25, 1991. In any event, a second request was made by letter of December 5, which the court treated as a motion to seal.

Even if the separate requests to the court by all parties were treated as a manifestation of their consent to the court's exercise of jurisdiction to consider modifications of the protective order, such a joint request made after the court had entered a final judgment of dismissal cannot confer jurisdiction on a United States district court contrary to the limitations imposed by the Constitution and laws of the United States.

This point is reinforced by the comment of this court when dismissing the appeal from the interlocutory protective order in this case:

The fact that the parties may settle the litigation and thereby foreclose appellate review does not make an interlocutory order immediately appealable.

*Id.* at 17, quoting the ORDER OF COURT entered October 18, 1991.

In view of this history of the protective order and the incorporation into the settlement agreement of some or all of the terms of the protective order as they existed at the moment of execution of the settlement agreement, the record before us lacks complete clarity about the extent to which protective terms survive as an order of the district court, even though not incorporated into the final judgment, or only as terms of the settlement agreement between the parties, or (perhaps by analogy to a consent decree) in some combination of court order and agreement of the parties.

For present purposes, nevertheless, I assume that the district court is not precluded from considering and ruling upon any motion for enforcement of the settlement agreement. Also, incident to such a motion, the district court may consider any request for interpretation of the agreement and—should grounds be shown for doing so, consistently with the law applicable to interpretation and enforcement of contracts—may receive evidence to resolve any ambiguity in the settlement agreement.

The motions before the court in this case, however, as well as the orders of December 10, 1991 and January 17, 1992, were focused on proposed modifications of the court's protective order as an order of the

court continuing in effect beyond the execution of the settlement and dismissal of the case. The motions were not viewed by the parties, their attorneys, or the court as motions seeking interpretation and enforcement of the settlement agreement. In these circumstances, even if we have jurisdiction to treat the motions in the district court as if they were motions to enforce (and interpret) the settlement agreement, and to treat the appeal from the district court's orders as properly before us for consideration on the merits to this limited extent, the more prudent course is not to do so. Neither the attorneys nor the district court viewed the matter as a proceeding to enforce the settlement. Nor has the matter been argued before us from this perspective. The better course is to allow the contentions of the parties, and any evidence relevant to their contentions, to be developed first before the district court.

In any event, exercising jurisdiction over motions to modify the protective order of August 2, 1991 is a very different matter from exercising jurisdiction to enforce a settlement agreement. If the appeal now before us is not to be dismissed for want of jurisdiction, I conclude that we should (a) vacate the district court's orders of December 10, 1991 and January 17, 1992 insofar as they purport to modify and continue in force, as modified, the protective order of August 2, 1992, and (b) remand with directions that the district court decline to exercise jurisdiction over any further motion by any of the parties to the settlement agreement, or their attorneys, seeking a substantive modification of the protective order to which they agreed as part of their settlement.