Leonard J. LeBLANC, Plaintiff, Appellant,

v.

B.G.T. CORPORATION, Defendant, Appellee.

No. 92–2366.

United States Court of Appeals, First Circuit.

Heard April 7, 1993.

Decided May 14, 1993.

Joseph G. Abromovitz, with whom John G. Balzer and Abromovitz & Leahy, P.C., Boston, MA, were on brief, for appellant.

Richard H. Pettingell with whom Debra A. Joyce and Morrison, Mahoney & Miller, Boston, MA, were on brief, for appellee.

Before SELYA, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

We must answer today a question of first impression in this circuit and, of late, in the courts of appeals: Does a person's status as a seaman in service of a ship necessarily end immediately upon termination of employment, thereby extinguishing a right to maintenance and cure which might otherwise be available under general maritime law? We think not. Because the court below applied a contrary rule, we vacate the judgment and remand for further development of the record.

## I. BACKGROUND

Plaintiff-appellant Leonard J. LeBlanc worked as an engineer aboard the F/V RESOLUTE, a commercial fishing boat owned by defendant-appellee B.G.T. Corporation.[1] The RESOLUTE set out from Fairhaven, Massachusetts on September 25, 1991. Shortly after its departure, the vessel broke down and returned to port for minor repairs. It then headed back to sea with a rehabilitated winch and renewed hopes, but, it appears, against the winds of fortune. The crew's efforts produced few fish.

Appellant grew uneasy in the face of disappointed expectations. Since his remuneration would reflect both the value of the catch and the expense of the voyage, he sought to truncate what had become a relatively unproductive and costly trip. His importunings placed him at loggerheads with the captain,

---

* Of the Federal Circuit, sitting by designation.

1. The litigants, who do not agree on very much, have a difference of opinion as to nomenclature. Although the case caption and appellant's filings refer to the defendant as "B.G.T. Corporation," the defendant persists in styling itself "B.T.G. Fisheries, Inc." This seems to us small beer, and we, following both alphabetical order and the lead of the magistrate judge, use the former appellation.

and a heated confrontation ensued. Although the parties vigorously debate the exact content of this war of words—appellant may or may not have been cashiered then and there—it is undisputed that the RESOLUTE turned back, arriving in New Bedford during the night of October 9. The following morning, the crew dislodged the catch. The RESOLUTE then made the five-minute journey to her dock in Fairhaven. Throughout, appellant continued to perform the ship's work.

Once the vessel docked, appellant, assisted by a fellow crew member, Peter Lynch, began unloading his gear. During this process, or shortly thereafter, the captain approached and gave appellant his "per."[2] Another argument erupted. In the course of this brouhaha, the captain either told or reminded appellant that he was fired and, at any rate, ordered him to remove his belongings from the boat. Ten to fifteen minutes later, appellant slipped while descending the stairs to the engine room and broke his right foot.

It remains unclear exactly what transpired in the brief interval between the second imbroglio and the accident. The parties agree that appellant removed some additional gear that he routinely kept aboard the RESOLUTE between voyages; but they disagree as to exactly how he accomplished this feat, i.e., whether he exited the vessel during the unloading process or, instead, stayed on board and handed his possessions over the side to Lynch. The record is similarly obscure concerning whether appellant succeeded in removing all his gear prior to injuring himself or, instead, as he claimed at trial, had yet to retrieve his boots from the engine room.

Following the mishap, appellant received maintenance checks for a period of time. As soon as the employer's attorney got wind of the accident and suggested that appellant, when injured, was no longer in the ship's service, the flow of funds stopped. Appellant then sued, including in his complaint a count for maintenance and cure under general maritime law. That count was tried by mutual consent before a magistrate judge. See 28 U.S.C. § 636(c)(1) (1988). After a two-day trial, the magistrate denied recovery for maintenance and cure. LeBlanc appeals.[3]

## II. ANALYSIS

■ The magistrate reasoned that appellant was not entitled to maintenance and cure because, as a matter of law, that remedy cannot attach after termination of employment. Since this was a bench trial in an admiralty case, the magistrate's findings of fact are reviewable only for clear error. See, e.g., DiMillo v. Sheepscot Pilots, Inc., 870 F.2d 746, 749 (1st Cir.1989); Clauson v. Smith, 823 F.2d 660, 661 (1st Cir.1987). However, appellant does not claim that the magistrate misperceived the facts, but, rather, that she applied an incorrect legal standard. We consider this claim of legal error de novo. See Liberty Mutual Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir.1992); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir.1992).

### A

Before addressing the merits of the appeal, we limn the seascape against which it arises. From time immemorial, the law of the sea has required shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in service of the ship. See, e.g., 1B Ellen M. Flynn et al., Benedict on Admiralty §§ 41–42 (6th ed. 1993) (finding the requirement extant in the Laws of Oleron and other ancient admiralty codes). The duty to provide maintenance and cure is today a firmly entrenched accouterment of general maritime law. See, e.g., Aguilar v. Standard Oil Co., 318 U.S. 724, 726, 63 S.Ct.

---

2. A "per" is a bonus provided to certain crew members, like the engineer, whose duties include the performance of special tasks. Appellant did not receive his basic remuneration—his crewman's "share"—until a later time.

3. LeBlanc also sued for negligence under the Jones Act, 46 U.S.C.App. § 688 (1988), and for

unseaworthiness under general maritime law. These claims remain in drydock. Notwithstanding the case's odd posture, we have appellate jurisdiction because the magistrate's order definitively resolved the maintenance-and-cure count. See 28 U.S.C. § 1292(a)(3) (1988) (providing for liberal interlocutory appeals in admiralty cases).

930, 931–32, 87 L.Ed. 1107 (1943); *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 521, 47 L.Ed. 760 (1903).

▮ The term "maintenance and cure" refers to the provision of, or payment for, food and lodging ("maintenance") as well as any necessary health-care expenses ("cure") incurred during the period of recovery from an injury or malady. *See, e.g., Aguilar*, 318 U.S. at 730, 63 S.Ct. at 933–34; *Calmar Steamship Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). As the label implies, the right is curative in nature and is thus to be distinguished from other admiralty rights, such as the right to recover lost wages or the right to recover for a shipowner's negligence, which are compensatory. *See Aguilar*, 318 U.S. at 730, 63 S.Ct. at 933–34. The right to maintenance and cure attaches largely without regard to fault; a seaman may forfeit his entitlement only by engaging in gross misconduct. *See, e.g., Calmar*, 303 U.S. at 527–29, 58 S.Ct. at 652–54. And, moreover, once the right to maintenance and cure has attached, the injured employee's entitlement continues, even after termination of service, until he is "so far cured as possible." *Farrell v. United States*, 336 U.S. 511, 518, 69 S.Ct. 707, 710–11, 93 L.Ed. 850 (1949); *accord Clauson*, 823 F.2d at 661 n. 1.

Developed though the doctrine may be in some respects, its scope has never been precisely delineated. While it is common ground that the right is available only to a "seaman" who is "in service of the ship" at the time an injury or illness eventuates, *see Aguilar*, 318 U.S. at 732, 63 S.Ct. at 934–35; *Osceola*, 189 U.S. at 175, 23 S.Ct. at 487, the meaning of these imbricated terms has evolved piecemeal over many decades and attempts at further refinement typically have been imbued with the factual residuum of particular cases. *See, e.g., McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348–53, 355–56, 111 S.Ct. 807, 814–16, 818, 112 L.Ed.2d 866 (1991); *Senko v. LaCrosse Dredging*

*Corp.*, 352 U.S. 370, 374, 77 S.Ct. 415, 417–18, 1 L.Ed.2d 404 (1957).[4] Thus, there are lingering questions as to the exact manner in which the right to maintenance and cure interfaces with the employment relationship. It is, for example, still unsettled whether the right to maintenance and cure is coterminous with, and a contractual attribute of, employed status, or, instead, whether the right retains a measure of independent force. *See* 2 Martin J. Norris, *The Law of Seamen* § 26:10 (4th ed. 1985) (collecting cases).

The instant case requires us to explore these uncharted waters, for B.G.T. contends, and the magistrate apparently believed, that termination of employment, in and of itself, necessarily and always prevents subsequent attachment of a right to maintenance and cure. We reject this thesis, concluding that the right to maintenance and cure stems from the employer-employee relationship but is not in all circumstances completely coextensive with it. As we explain below, a number of different considerations undergird this conclusion.

### B

▮ One pylon upon which our holding rests is an appreciation of the historical purpose of maintenance and cure. A common thread running through the reported cases, some of them centuries old, is that maintenance and cure must always be viewed as an alleviatory remedy. Seamen should receive it because the nature of their employment necessitates their exposure to the peculiar hazards of seafaring life while at the same time leaving them utterly dependent on the ship, which serves as the very framework for their existence. *See, e.g., Farrell*, 336 U.S. at 514–16, 69 S.Ct. at 708–09; *Aguilar*, 318 U.S. at 731–34, 63 S.Ct. at 934–36; *Harden v. Gordon*, 11 F.Cas. 480, 483 (C.C.D.Me.1823) (No. 6,047) (Story, J.); *see also Wilander*, 498 U.S. at 354, 111 S.Ct. at 817 (stating that a seaman's remedies grow out of "his pecu-

---

4. Although the cited cases involve the Jones Act, 46 U.S.C.App. § 688, general maritime law and the jurisprudence of the Jones Act have largely evolved in tandem. *See Wilander*, 498 U.S. at 341–42, 111 S.Ct. at 810–11. Moreover, those falling within the prophylaxis of the Jones Act

are also among the class of persons who are afforded the primary protections of general maritime law, of which maintenance and cure is a prime exemplar. *See* 1B Flynn et al., *Benedict on Admiralty, supra*, § 44.

liar relationship to the vessel, and ... the special hazards" of seafaring) (citation and internal quotation marks omitted). Because it was feared that without the right to maintenance and cure as an inducement few might willingly devote themselves to a way of life that would both render them at risk and leave them friendless in the face of the assumed risk, *see Calmar*, 303 U.S. at 528, 58 S.Ct. at 653; *see also Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 521 (1st Cir.1989) ("The obligation for maintenance and cure arose, historically, from the irresponsible behavior of shipowners who set disabled seamen ashore at foreign ports to shift for themselves."), the benefits of maintenance and cure have not been limited to victims of predictable shipboard injuries. For instance, in ruling that a seaman injured while on shore leave could receive maintenance and cure, Justice Rutledge wrote:

> The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If, in those surroundings, the seaman ... incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association.... In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.

*Aguilar*, 318 U.S. at 734, 63 S.Ct. at 935–36. This historical perspective—a seaman's lifestyle makes him dependent on the ship while simultaneously ensuring his exposure to the variegated risks of seafaring, thus warranting an alleviatory remedy—is what stands behind, and gives meaning to, the black letter rule that seamen who are, broadly speaking, in the ship's service when injured merit maintenance and cure.

### C

A second pylon upon which our holding rests goes hand in glove with this historical perspective. Linguistically, the entitlement to maintenance and cure must not be defined grudgingly. While the "seaman in service" language has at times appeared to acquire a restrictive gloss, we believe that any meaningful interpretation of the phrase must remain moored to maintenance and cure's core purpose: palliating the disadvantages of seafaring life. Thus, the nature of the right

> require[s] that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes. If leeway is to be given in either direction, all the considerations which brought the [right] into being dictate it should be in the sailor's behalf.

*Aguilar*, 318 U.S. at 735, 63 S.Ct. at 936.

It is for this reason that a certain expansiveness rightfully attends determinations of whether a person is a seaman in service of the ship. To cite one example, we recently ruled that a sailor injured at home on a Sunday was entitled to maintenance and cure although his ship was not due to sail until the following Tuesday, observing that "the captain could have changed his mind and decided to sail Monday and required plaintiff to do the preparatory boat work Sunday, holiday or not." *Macedo*, 868 F.2d at 520–21. As this illustration makes clear, if a person is enduring circumstances which, in a rather general sense, further the ship's purposes, he may well be deemed in the ship's service. *Accord Farrell*, 336 U.S. at 516, 69 S.Ct. at 709–10 (holding that a seaman is in the ship's service when he is generally answerable to the call of duty).

The Supreme Court's most recent visit to these straits exemplifies the same strain of interpretive generosity in a slightly different context. In *Wilander*, an employee whose duties consisted of supervising the painting of a sea-bound drilling platform was injured. He sued, seeking a seaman's remedies. The Court, refusing to impose a requirement that, to be a seaman, one must aid in the navigation of a vessel, concluded instead that "[t]he key to seaman status is employment-related connection to a vessel." *Wilander*, 498 U.S. at 355, 111 S.Ct. at 817.[5]

---

5. It can, of course, be argued that cases dealing with the question of who qualifies as a seaman, *see, e.g., Wilander*, 498 U.S. at 337, 111 S.Ct. at 807, are distinguishable. However, the two most

In sum, the motivational impetus behind maintenance and cure dictates availability of the anodyne whenever a plaintiff's injury or illness occurs amidst circumstances endured in furtherance of, and as a result of, an employment, the duties of which help accomplish the mission of a vessel in navigation. This formulation makes clear that, while the right to maintenance and cure stems from a person's employment, there is no reason to assume that the right and the employment are coterminous with each other. Indeed, the decided cases indicate the contrary. *See Aguilar,* 318 U.S. at 730, 63 S.Ct. at 933–34 (explaining that the right to maintenance and cure arises "as an incident of the marine employer-employee relationship"); *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932) (explaining that the right to maintenance and cure "has its source in a relation which is contractual in origin").

#### D

A third pylon on which our holding rests reflects a policy judgment. We recognize that the possibility of maintenance and cure attaching will end in most instances when the employment relationship expires. But, this need not invariably be the case. We are of the opinion that taking a mechanical approach, as appellee urges, would as a matter of policy be incompatible with the Court's repeated eschewal of sharp-edged rules limiting seamen's rights. *See, e.g., Wilander,* 498 U.S. at 354–55, 111 S.Ct. at 817–18; *Desper v. Starved Rock Ferry Co.,* 342 U.S. 187, 190, 72 S.Ct. 216, 218, 96 L.Ed. 205 (1952).

What is more, a strict cut-off point of the sort urged by appellee would sometimes run at cross purposes with the historical antecedents and definitional imperatives of maintenance and cure. *See supra* Parts II(B), (C). We think this is so because the life of a

seaman requires that he be drawn into the separate world of the ship and subjected to the unique risks present therein. If he is terminated while still in that realm, the separation and its risks—which are, after all, the twin rationales for providing maintenance and cure—do not instantly evaporate. Nor, therefore, does the seaman's persona change, like Cinderella at the stroke of twelve, from a servitor of the ship to a landlubbing interloper. Rather, the title "seaman" must remain attached at least until the individual has finished his shipboard tasks (unless duly relieved of them) and had a reasonable chance to exit from the maritime realm, or, put another way, for so long as the twin rationales remain in force. Just as the Court deemed Aguilar a seaman in service of the ship because the risks inherent in his situation were necessitated by the ship's business, *see Aguilar,* 318 U.S. at 734, 63 S.Ct. at 935–36, so, too, a person cashiered while on board a vessel remains a seaman furthering its purposes at least until he is afforded reasonable time and opportunity for disembarkation.

#### E

The last pylon on which our holding rests is hewn from the caselaw. There is a venerable court of appeals decision directly on point in which the plaintiff, after being fired, injured himself while leaving the ship. The Fourth Circuit held that

> the obligation of the ship to furnish maintenance and cure attaches to accidents which happen in the brief interval between the time a seaman is paid off and formally discharged and the subsequent time at which, in ordinary course, he actually gets physically away from her. He went on her as a seaman, and for the purpose in hand he did not cease to be one until he was safely off her.

frequently asked questions in seamen's cases— Who is a seaman? Was the seaman in service of the ship?—overlap. The former question usually reduces to asking: How connected with the ship's function must a person's duties be in order for the mine run of rights under maritime law to attach? The latter question usually reduces to

asking: How connected with the ship's function must the injury-inducing circumstances be in order for such rights to attach? In our estimation, the answers to both questions shed light upon the quandary we face here, namely, whether it is necessarily true that a seaman in service of the vessel instantly loses that status upon discharge.

*The Michael Tracy*, 295 F. 680, 681 (4th Cir.1924). We believe that this statement of the law continues to shine brightly, undimmed by the passage of time.[6]

We discern further decisional support for our conclusion in the closely related area of workers' compensation law. Although statutes differ from state to state, the general rule stipulates that "coverage is not automatically and instantaneously terminated by the firing or quitting of the employee" but extends for a reasonable period thereafter so that the employee may "wind[ ] up his affairs and leave[ ] the premises." 1A Arthur Larson, *The Law of Workmen's Compensation* § 26.10 (1993) (collecting cases); *see also id.* §§ 26:30–26:40 (indicating that a "reasonable period" incident to severance of employment encompasses time to pick up a paycheck and retrieve personal effects); Elmer H. Blair, *Reference Guide to Workmen's Compensation* § 5:03 (1974 & Supp.1993) ("When a workman is discharged, the right to compensation as an employee is not lost until he has had a reasonable time to collect his pay and his personal belongings, and leave the premises of his employer.").

We think the presence of this "reasonable period" standard in workers' compensation law takes on a special significance for our purposes because an injured seaman's entitlement to maintenance and cure is widely thought to impose "a broader liability than that imposed by modern workmen's compensation statutes." *Aguilar*, 318 U.S. at 732, 63 S.Ct. at 934–35; *see also* 2 Norris, *supra*, § 26:40 ("Maintenance and cure under the general maritime law is far more liberal in its application than are most of the present workmen's compensation acts.").

**F**

 We need go no further. The four pylons we have described form an integrated foundation. Building on that foundation, we hold that the right to maintenance and cure made available by general maritime law to seamen injured or falling ill while in service of the ship may attach after termination of employment so long as the triggering event takes place within the period of time reasonably needed for the accomplishment of tasks in general furtherance of winding up the seaman's employment—the prototypical examples being removing one's belongings, quitting the ship, or implementing direct orders given at the time of discharge.

In the case at hand, the magistrate judge applied a different, incorrect legal standard. Moreover, the record is not sufficiently developed to allow us to resolve the controversy by regrouping the available findings of fact along the proper legal matrix.[7] The case must, therefore, be remanded for further consideration in light of this opinion, and for such further proceedings as may be required. Although it is apparent that the entire case need not be retried, we in no way intend to limit the scope of the magistrate judge's inquiry on remand, but leave that to her informed discretion. In the same vein, we see no reason for the interposition of a new trier.

***Vacated and remanded. Costs to appellant.***

---

**6.** B.G.T. suggests that *Fisher v. Cleveland Cliffs Iron Co.*, 1975 A.M.C. 1570 (W.D.Pa.1975), a case in which the district court abjured the rule of *Tracy*, is the beacon by which we should steer. We disagree. First, *Fisher's* reasoning depends upon statements (dicta in decisions and passages in commentary) treating with unrelated questions. *See id.* at 1577–78. Second, none of this rumination actually rules out recovery by recently fired employees. *See id.* On the whole, *Fisher* is unsupported by the authorities upon which it purports to rely. Hence, we, like the commentators, *see, e.g.*, 2 Norris, *supra*, § 26.31, consider *Tracy* more persuasive.

**7.** Without attempting to be all-inclusive, we cite two examples of potentially important uncertainties. (1) The record is inscrutable with regard to whether LeBlanc, after the second imbroglio, alighted from the RESOLUTE, and then returned, or whether he remained on board. (2) There is some dubiety as to whether LeBlanc, at the time of his injury, was carrying out a direct order to remove his gear from the ship. The magistrate made no clear finding on either point, nor did she address the question of when LeBlanc's injury occurred with respect to the reasonable period of time needed to wind up his legitimate business on board the RESOLUTE.