PETITION OF RJF INTERNATIONAL CORPORATION FOR EXONERATION FROM OR LIMITATION OF LIABILITY, CIVIL AND MARITIME.

No. C.A.01–588S.

United States District Court,
D. Rhode Island.

Aug. 10, 2004.

See also 354 F.3d 104.

Robert Edward Collins, Thomas E. Clinton, Thomas J. Muzyka, Esq., Kenneth M. Chiarello, Esq., Clinton & Muzyka, P.C., Boston, MA, Michael Richard Hagopian, Warwick, RI, for Petitioner.

Anthony C. DiGioia, Esq., U.S. Attorney's Office, Providence, RI, Clifford M. Pierce, Boston, MA, for Intervenor–Plaintiff.

John S. Foley, Esq., Howard B. Klein, Jennifer Anne Barry, Esq., Decof & Decof P.C., Providence, RI, John W. Merting, John W. Merting, P.A., Gulf Breeze, FL, Andrew V. Buchsbaum, Esq., Friedman & James LLP, New York City, Dennis J. Roberts, II, Esq., Providence, RI, Gabriella G. Gaal, Esq., Warwick, RI, for Claimants.

Lane W. Newquist, Esq., Anthony C. DiGioia, Esq., U.S. Attorney's Office, Providence, RI, for Movants.

Richard Donovan, Boston, MA, Pro Se.

### *DECISION AND ORDER*

SMITH, District Judge.

■ "From time immemorial, the law of the sea has required shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in service of the ship." *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 396 (1st Cir.1993). And in more modern times it is not uncommon that a seaman receiving maintenance and cure from a shipowner may be so severely injured that he also becomes entitled to disability benefits under the Social Security Act of 1965. By being "disabled" under the Social Security Act, a seaman becomes eligible for Medicare, which covers (at least in part) the same medical obligations the shipowner is required to pay as part of

its maintenance and cure obligation. Accordingly, in such circumstances, a seaman has two potential sources available for coverage of his financial obligations. The question presented is whether Medicare supplants maintenance and cure as the payor of first resort when a seaman becomes Medicare eligible.

This tragic case involves a young seaman, James Avery ("Avery" or "Claimant"), who was injured on August 11, 2001 while working on the Petitioner's vessel when it was docked in Newport, Rhode Island.[1] Before the Court is RJF International Corporation's ("RJF" or "Petitioner") Motion to Terminate Maintenance and Cure Benefits. RJF contends that it no longer is obligated to provide Avery with "cure" due to his entitlement to Medicare benefits. RJF primarily relies on the Second Circuit's decision in *Moran Towing & Transp. Co. v. Lombas*, 58 F.3d 24 (2d Cir.1995), which held that an injured seaman's eligibility for free medical treatment under Medicare satisfies a vessel owner's obligation to furnish cure. This is a matter of first impression in this Circuit.

On March 19, 2004, the Court heard oral argument on RJF's motion.[2] The parties submitted post-hearing briefs relating to the interpretation of several complex statutory schemes at issue in this case. For the reasons discussed below, the Court denies the petition of RJF.

## I. *Facts*

For the complete background of the facts relating to this Motion, the reader is directed to the Court's published decision in *RJF I*. See 261 F.Supp.2d 101 (D.R.I. 2003), *aff'd* 354 F.3d 104 (1st Cir.2004). For purposes of this Motion, a brief précis will suffice:

On August 11, 2001, Avery was a seaman working on the M/V Reflections, a vessel owned by Petitioner. While the vessel was docked at Bannister's Wharf in Newport Harbor, Avery fell from the ship, struck his head on a dock, and then fell into the water. As a result of the accident, Avery suffered severe brain injuries, for which he has been treated at numerous healthcare facilities. Avery has not reached a state of maximum medical recovery, *id.* at 106, and is currently receiving various outpatient services to assist in his recovery.

On February 1, 2004, Avery became eligible for benefits under Parts A and B of the Medicare Program, which entitle him to a monthly payment of $510 in Social Security benefits, from which a Medicare Part B monthly premium of $66.60 is deducted.

## II. *"Cure"*

■ "Cure" refers to the shipowner's obligation to provide health-care expenses

---

**1.** This is the second motion to terminate maintenance and cure benefits brought by the Petitioner in this case. In the first motion, RJF contended that Avery had reached the point of "maximum medical recovery" and was therefore no longer entitled to the benefits under existing First Circuit case law. This Court disagreed and found in favor of Avery. *In re RJF Int'l Corp.*, 261 F.Supp.2d 101 (D.R.I.2003)("*RJF I*"). RJF then appealed the denial of its motion to the First Circuit, which affirmed the decision of this Court. *See In re RJF Int'l Corp.*, 354 F.3d 104 (1st Cir.2004). On appeal, RJF argued that its

maintenance and cure obligation should be curtailed because Avery was eligible for Medicare, but the court did not countenance the argument because it was not properly raised in this Court. *See id.* at 107–08.

**2.** Because of the implications of RJF's argument on the Medicare system, the Court permitted the uncontested joinder of the U.S. Department of Health and Human Services as a party pursuant to Rules 19, 20, and 21 of the Federal Rules of Civil Procedure.

incurred during the period of the injured seaman's recovery. *LeBlanc,* 992 F.2d at 397 (citing *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107 (1943)). A seaman's entitlement to cure is, for the most part, automatic upon falling injured or ill. "The right attaches 'largely without regard to fault; a seaman may forfeit his entitlement only by engaging in gross misconduct.'" *Ferrara v. A. & V. Fishing, Inc.,* 99 F.3d 449, 454 (1st Cir.1996) (quoting *LeBlanc,* 992 F.2d at 397). An injured seaman's right to cure continues until he has reached the point of "maximum medical recovery." *In re RJF,* 354 F.3d at 107 (citing *Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)).

III. *Medicare*

The United States administers the Medicare program, 42 U.S.C. § 1395 *et seq.,* through the Department of Health and Human Services ("HHS"). Medicare is health insurance for the elderly and disabled, and is funded by contributions through payroll deductions (commonly known as "FICA"). When an individual becomes eligible for Medicare, contributions to the Medicare program continue through co-payments, deductibles, and premiums. Medicare is divided into two parts ("Medicare Part A" and "Medicare Part B"), which differ in terms of their benefits, eligibility, and administration. Medicare Part A, 42 U.S.C. § 1395c *et seq.,* provides for the payment of inpatient hospital and related post-hospital benefits on behalf of eligible individuals. Part A benefits are available to individuals age 65 and older who receive Social Security or railroad retirement benefits, and to individuals under age 65 who have been receiving Social Security disability benefits for 24 months. 42 U.S.C. § 1395c. Part A benefits are also available to individuals age 65 and older who have not earned the neces-

sary work credits for Social Security retirement benefits by making voluntary monthly premiums. 42 U.S.C. § 1395i–2. Part A payments are made from the Federal Hospital Insurance Trust Fund, 42 U.S.C. § 1395i, which is financed by hospital insurance taxes paid by employers, employees, and the self-employed, as well as by voluntary monthly premiums.

Medicare Part B, 42 U.S.C. § 1395j *et seq.,* is the supplemental medical insurance program, which covers physicians' services and various ancillary health care expenses. Part B benefits are available to individuals eligible for Part A coverage who choose to enroll in the supplemental program and pay monthly premiums. 42 U.S.C. §§ 1395p and 1395r. The benefits are paid from a separate trust fund, the Federal Supplementary Medical Insurance Trust Fund, 42 U.S.C. § 1395t, which is financed by the premiums paid by enrollees, together with matching government contributions. 42 U.S.C. § 1395w.

Originally, Medicare was the primary source of payment for the medical expenses of all of its beneficiaries, with one exception—where payment had been or could reasonably be expected to have been made by a workers' compensation law or plan. 42 U.S.C. § 1395y(b)(1). However, as Medicare expenditures rose dramatically, Congress looked to private insurance to cover a greater share of medical services. *See* H.R.Rep. No. 96–1167, 96th Cong., 2d Sess. 389, *reprinted in* 1980 *U.S.C.C.A.N.* 5752. In 1980, Congress passed the Omnibus Budget Reconciliation Act, which contained the Medicare Secondary Payer ("MSP") provisions. The intention of the MSP statute was to reduce Medicare spending, as well as insure the financial integrity of the Medicare program. *See* P.L. No. 96–499, § 953; P.L. No. 97–35, § 2146; P.L. No. 97–248, § 116; P.L. No. 98–369, § 2301; P.L. No. 99–272, § 9201;

and P.L. No. 99–509, § 9319; *see generally United States v. Baxter Int'l., Inc.,* 345 F.3d 866, 874 (11th Cir.2003) (noting that the MSP is a collection of statutory provisions codified during the 1980s with the intention of reducing federal health care costs). In general, the MSP shifts the responsibility for making primary payment for the services provided to Medicare beneficiaries from Medicare to other health care payors.

In pertinent part, the MSP statute, in its current form, provides as follows:

**(A) In general**

Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that—

.　　.　　.　　.　　.

(ii) payment has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations) under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance.

In this subsection, the term "primary plan" means ... a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies.

42 U.S.C. 1395y(b)(2). The MSP also allows HHS to recover payments made by Medicare when it turns out that the service in question has been or should have been covered by a primary plan. 42 U.S.C. § 1395y(b)(2)(B)(iii) (providing the United States a direct right of action to recover a conditional Medicare payment from any entity that is or was responsible for paying for the service under a primary plan). The United States is entitled to double damages when a primary plan fails to reimburse Medicare for its conditional payments. 42 U.S.C. 1395y(b)(2)(B)(iii).

As explained in *Cochran v. U.S. Health Care Financing Admin.,* 291 F.3d 775, 777 (11th Cir.2002):

[I]f payment for covered services has been or is reasonably expected to be made by someone else, Medicare does not have to pay. In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay....

The purpose of the MSP is "to keep the government from paying a medical bill where it is clear an insurance company will pay instead." *Fanning v. United States,* 346 F.3d 386, 389 (3d Cir.2003).

HHS has promulgated regulations implementing the MSP statute, 42 C.F.R. § 411.20 *et seq.,* which, *inter alia,* provide that Medicare pays secondary to a third party payor such as an insurance plan or workmen's compensation law "even if State law or the third party payer states that its benefits are secondary to Medicare benefits, or otherwise limits its payments to Medicare beneficiaries." 42 C.F.R. § 411.32(a)(1).

**IV.** *Analysis*

 The Petitioner contends that Avery's eligibility for Medicare terminates its cure obligation. The Petitioner attempts to bring Medicare under the umbrella of the general rule that, under the doctrine of maintenance and cure, a shipowner will not be required to pay for medical care that is furnished at no expense to the injured seaman. *See, e.g., Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 92 L.Ed. 468 (1948) (seaman not entitled to maintenance and cure for support and care provided by his parents); *Shaw v. Ohio River Co.,* 526 F.2d 193, 201

(3d Cir.1975) (shipowner has no obligation to provide cure for payments made to seaman under an employer-funded Blue Cross health insurance plan); *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293, 1296 (5th Cir. 1973) (seaman not entitled to maintenance and cure for time spent in public hospital); *Bavaro v. Grand Victoria Casino*, No. 97 C 7921, 2001 WL 289782, at *7 (N.D.Ill. Mar. 15, 2001) (collecting cases). The Petitioner argues that Avery's eligibility for Medicare, an alleged type of cost-free medical treatment, bars him from an entitlement to cure payments. Avery and HHS assert two defenses to the Petitioner's argument: (1) Medicare is not "free" and therefore does not end RJF's obligation to provide cure payments; and (2) even if Medicare amounts to "free" medical treatment under maritime common law, the MSP statute bars HHS from providing Medicare payments when other payors (in this case, RJF or its insurer) are obligated to make payments.

To appreciate fully the period of time in a seaman's recuperative period that may be at issue, it is important to consider the scope of the overlap between cure and Medicare. A seaman automatically becomes entitled to maintenance and cure at the time of injury. *See Ferrara*, 99 F.3d at 454. From that point, cure continues until the seaman has reached "maximum medical recovery." *See RJF*, 354 F.3d at 106. In circumstances where a seaman is deemed "disabled" under the Social Security Act due to his injuries, he will become eligible for Medicare after a waiting period of twenty-five months. *See* 42 U.S.C. § 426(b); 42 C.F.R. § 406.12(a). During that waiting period, a seaman who has not reached maximum medical recovery is entitled to cure payments. It is not until the expiration of the waiting period that the cure and Medicare entitlements overlap. Moreover, once a seaman who is entitled to Medicare reaches maximum medical recovery, he will have to rely solely on Medicare because the shipowner's cure obligation is satisfied. Therefore, the dispute in this case focuses upon the period of time between the expiration of Medicare's twenty-five month waiting period (the point at which a seaman becomes eligible for Medicare), and the seaman's subsequent attainment of maximum medical recovery. This period of time will vary on a case-by-case basis. In the present case, the Claimant's entitlement to Medicare commenced in February 2004 and is continuing.

In support of its contention that Medicare is cost-free medical treatment, the Petitioner urges this Court to adopt the reasoning of the Second Circuit in *Moran*. In *Moran*, the seaman, Lombas, suffered injuries to his neck and spine while working on a tugboat in Staten Island, New York. Moran, the seaman's employer, timely provided maintenance and cure payments for various treatments, including surgery. Sometime later, due to the extent of his injuries, Lombas began receiving Social Security disability benefits and subsequently became eligible for Medicare. When physicians recommended that Lombas undergo additional surgery, Lombas discovered that his surgeon would not accept Medicare as payment for the medical services. Lombas then contacted Moran, insisting that his employer—pursuant to its cure obligation—cover the expense of the surgery. Moran refused to cover the expense and informed Lombas that he had to choose a surgeon that accepted Medicare since Moran's obligation to provide cure had been satisfied by his eligibility for Medicare. The district court ruled that a seaman's eligibility for Medicare, as the functional equivalent of the treatment once provided to seamen in Public Health Service Hospitals, ended Moran's obligation to provide cure. *See Moran Towing &*

*Transp. Co. v. Lombas,* 843 F.Supp. 885, 887 (S.D.N.Y.1994).

On appeal, the Second Circuit affirmed. The court adopted the reasoning of the district court and held that the availability of Medicare, like the availability of treatment at a Public Health Service Hospital, satisfied a shipowner's cure obligation.

As [the district court] noted, for a period in the history of the doctrine of maintenance and cure, seamen were able to receive virtually cost-free treatment in the United States Public Health Service marine hospitals, and 'the caselaw made it clear that the availability of such cost-free 'cure' satisfied the shipowner's contractual obligation to provide cure.'

*Moran,* 58 F.3d at 25 (citation omitted).[3] The court then found " 'no reasoned distinction ... in law or policy' between Medicare and the provision of health care through the public hospitals to the extent that Medicare-covered treatment is paid for by the government." *Id.* at 26. The *Moran* holding has since been adopted by other district courts. *See, e.g., Toulson v. Ampro Fisheries, Inc.,* 872 F.Supp. 271 (E.D.Va.1995); *Blige v. M/V Geechee Girl,* 180 F.Supp.2d 1349 (S.D.Ga.2001).

Avery and HHS argue that the reasoning in *Moran* is flawed because Medicare is not free to beneficiaries, and therefore is distinguishable from the cost-free medical services once rendered by the PHS Program. Unlike the PHS Program, which was financed entirely by general tax revenues, Medicare is funded by the recipients of the medical care. Medicare Part A is funded entirely by the hospital insurance taxes paid by current and future beneficiaries, as well as monthly premiums paid by some current beneficiaries. There are no contributions made to Medicare Part A from general tax revenues. *See* 42 U.S.C. § 1395i(a). Medicare Part B recipients are required to pay monthly premiums for their coverage. *See* 42 U.S.C. § 1395w.

Accordingly, Avery and HHS argue that since Medicare is funded directly by employees and beneficiaries, it is more analogous to benefits provided under a private medical or disability insurance policy, which several courts have held do not satisfy a shipowner's cure obligation. In *Gauthier v. Crosby Marine Serv., Inc.,* 752 F.2d 1085 (5th Cir.1985), the Fifth Circuit held that a seaman's eligibility for benefits under a private health insurance policy did not relieve the shipowner of its duty to provide cure. *Id.* at 1090. The Fifth Circuit reasoned that, while a shipowner is not obligated to pay for services provided to a seaman by "the charity of others or the public at large," the seaman in *Gauthier* "had incurred expenses because he alone paid the medical insurance premiums." *Id.* Similarly, in *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525 (9th

---

3. Created in 1798, the Public Health Service Hospitals Program (the "PHS Program") was operated as a federally financed medical care system for merchant seaman. The original purpose of the program was to protect the United States from communicable diseases that could be brought into the country from foreign ports at a time when there were few medical facilities in American port cities. *See* S.Rep. No. 97–139, 97th Cong., 1st Sess. 880, *reprinted in* 1981 *U.S.C.C.A.N.* 903. Through the years, the program was expanded to cover all merchant seamen from tugboat operators and fishermen to oceangoing seamen. In 1981, Congress disbanded the PHS Program to cut federal expenditures, because American port cities now have ample medical facilities, and because the hospitals were under-utilized. *See* Omnibus Budget Reconciliation Act of 1981, Pub. Law. No. 97–35, § 987 (1981). During the existence of the PHS Program, a shipowner's duty to provide cure could be discharged "by the issuing of a master's certificate carrying admittance to a public hospital...." *Kossick v. United Fruit Co.,* 365 U.S. 731, 737, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

Cir.1962), the Ninth Circuit determined that an award for maintenance and cure would not be reduced by the benefits paid to a seaman under a state disability program. The Court noted that the disability payments came from a fund "created largely by the contributions of the beneficiaries" and, therefore, were "indistinguishable from benefits which might be received from disability insurance privately procured by the injured individual." *Id.* at 537.

Practically speaking, the question of whether Medicare provides cost-free medical care (and therefore is the functional equivalent of the PHS Program) becomes a policy question: should the economic burden of the medical care for an injured, disabled seaman who is eligible for Medicare rest upon the shipowner (and/or his insurer), or upon the Medicare system? Either way, the costs of care are passed on to large segments of society. For example, when Medicare covers the seaman's medical payments that exceed the premiums and co-payments that have been contributed, the cost of this excess burden is passed on to the Medicare participants. If a shipowner must continue to provide cure payments, and is covered by liability insurance for cure payments, the cost of such payments is. no doubt passed on in the form of higher insurance premiums for all insureds. The question of which class of participants in our economy should bear the economic burden of a catastrophic case is better left to Congress, and not the courts.

■ Even if this Court were to adopt *Moran's* reasoning and hold that Medicare truly is cost-free and therefore the functional equivalent of the PHS Program, the MSP statute would prevent RJF from shifting the burden of shouldering Avery's medical care to the Medicare system. As stated *supra* at 461–462, the MSP provides that Medicare may not pay for a medical service for which payment has been made or can reasonably be expected to be made under a "primary plan." 42 U.S.C. § 1395y(b)(2)(A)(ii). The MSP defines a primary plan to include a "liability insurance policy or plan (including a self-insured plan)" and a "workmen's compensation law or plan." *Id.* Accordingly, under the MSP and regulations promulgated thereunder, Medicare is barred from providing payments to eligible beneficiaries when a primary plan is obligated to cover the same medical expenses—in other words, Medicare must be the secondary payor in those circumstances.

Avery and HHS contend that the MSP bars Medicare from making payments resulting from medical care for Avery's injuries for two reasons. First, because maintenance and cure is the admiralty analog to state and federal workmen's compensation law, which is clearly covered by the MSP, Medicare is barred from making payments. Second, RJF is insured by a $10,000,000 "Yacht" insurance policy that provides coverage for "bodily injury loss," which is a "liability insurance policy or plan" under the MSP statute.

With respect to the workmen's compensation argument, Avery directs the Court to a number of cases that refer to cure as analogous to workmen's compensation. *See, e.g., Reyes v. Delta Dallas Alpha Corp.,* 199 F.3d 626, 629 (2d Cir.1999) (analogizing maintenance and cure to workers' compensation); *Guevara v. Maritime Overseas Corp.,* 34 F.3d 1279, 1284 (5th Cir.1994) (referring to maintenance and cure as "[e]ssentially a form of workers' compensation-like employee benefit"); *LeBlanc,* 992 F.2d at 400 (referring to workmen's compensation law as "closely related" to maintenance and cure); *Alrayashi v. Rouge Steel Co.,* 702 F.Supp. 1334, 1338 (E.D.Mich.1989) ("An action for main-

tenance and cure is general maritime law's equivalent of workmen's compensation."); *In re Falcon Workover Co.*, No. CIV. A. 98–0005, CIV. A. 98–1443, 1999 WL 243657, at *5 (E.D.La. April 21, 1999); *Kelly v. Bass Enter. Prod. Co.*, 17 F.Supp.2d 591, 599 (E.D.La.1998) (noting that "[t]he seaman ... has a claim for maintenance and cure—in many ways the equivalent of workers compensation"); *Etu v. Fairleigh Dickinson Univ. West Indies Lab., Inc.*, 635 F.Supp. 290, 294 (D.Vrgin Islands 1986) (stating that "[m]aintenance and cure is similar to workmen's compensation").

All of these cases rely heavily on analogy. HHS' own regulations, however, define "workers' compensation plan" to include "the workers' compensation plans of the 50 States, the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands, as well as the systems provided under the Federal Employees' Compensation Act and the Longshoremen's and Harbor Workers' Compensation Act." 42 C.F.R. § 411.40(a). The doctrine of maintenance and cure is conspicuously absent from this list. HHS could easily have included the doctrine within the definition but chose not to do so. Furthermore, the analogy between workmen's compensation law and the maritime doctrine of maintenance and cure, as represented in the citations to the afore-mentioned case law, over simplifies matters. In *LeBlanc*, the First Circuit recognized this problem when it drew a comparison between workmen's compensation law and the doctrine of maintenance and cure, but noted that "an injured seaman's entitlement to maintenance and cure is widely thought to impose 'a broader liability than that imposed by modern workmen's compensation statutes.'" 992 F.2d at 400 (quoting *Aguilar*, 318 U.S. at 732, 63 S.Ct. 930). Moreover, a leading admiralty treatise has taken a view different from the

cases cited by the Claimant with respect to the similarities between maintenance and cure and workmen's compensation.

> Maintenance and cure as a seaman's remedy has little resemblance to the statutory remedies and procedures of the workmen's compensation laws, either State or Federal....

> Maintenance and cure under the general maritime law is far more liberal in its application than are most of the present workmen's compensation acts.

Martin J. Norris, *The Law of Seamen* § 26:40, at 103–04 (4th ed.1985). Workmen's compensation, for example, typically requires that the injured employee suffer a work-related injury in order to recover, whereas maintenance and cure has no such requirement. Additionally, maintenance and cure is a "strict liability" type of obligation for the shipowner and must be provided automatically and immediately upon a seaman's injury, whereas, with workmen's compensation, the comparative fault of the employee is relevant to an award. Accordingly, although the Court finds the Petitioner's argument well-reasoned in many respects, it is leery of reading the doctrine of cure into the MSP statute. The Court is particularly hesitant to interpret the statute in such a manner when the case can be resolved on other grounds.

Avery and HHS' argument that RJF's yacht insurance policy bars Medicare from making payments resulting from Avery's injuries, because it is a "liability insurance policy or plan" under the MSP, is a stronger one. Under the MSP statute, "liability insurance" is defined as

> insurance (including a self-insured plan) that provides payment based on legal liability for injury or illness or damage to property. *It includes, but is not limited to,* automobile liability insurance, uninsured motorist insurance, underin-

sured motorist insurance, homeowners' liability insurance, malpractice insurance, product liability insurance, and *general casualty insurance.*

42 C.F.R. § 411.50(b)(2003) (emphasis added). It is unclear from the text of the statute, and the regulations promulgated thereunder, whether the types of liability insurance itemized in 42 C.F.R. § 411.50(b) refer to policies purchased by the Medicare beneficiary, or whether they also include liability policies that insure an entity or individual that has caused harm to the beneficiary. However, considering the overall purpose of the MSP statute—to reduce Medicare spending and ensure its financial integrity—this Court finds it more likely that Congress intended the MSP to apply to all kinds of liability insurance policies that may cover a Medicare beneficiary's medical expenses. This is supported by the fact that, if the MSP were construed so as to apply only to liability insurance purchased by the beneficiary, then many of the types of liability insurance listed in 42 C.F.R. § 411.50(b) would frequently be inapplicable. For example, automobile insurance, homeowners' liability insurance, malpractice insurance, product liability insurance, and general casualty insurance are all types of insurance that are predominately purchased by an insured to protect against liability for injuries that happen to others, not to themselves (such as with healthcare insurance). These principles, considered in light of the Medicare cost-saving purpose of the MSP, persuade the Court that RJF's yacht insurance policy is the type of liability insurance policy covered by the MSP. Consequently, this Court holds that the MSP statute bars the Petitioner from shifting the financial burden of its cure obligation for Avery's medical expenses to the Medicare system.

## V. *Conclusion*

For the foregoing reasons, the Petitioner's Motion to Terminate Avery's Maintenance and Cure Benefits Because of His Eligibility for Medicare is DENIED.

IT IS SO ORDERED.