07-1107-cv
Eli Lilly & Co. v. James B. Gottstein

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: February 2, 2010,                                    Decided: August 12, 2010)

Docket No. 07-1107-cv

_____

ELI LILLY & CO.,

*Movant-Appellee,*

v.

JAMES B. GOTTSTEIN,

*Respondent-Appellant,*

VERA SHARAV, ALLIANCE FOR HUMAN RESEARCH PROTECTION, JOHN DOE,

DAVID S. EGILMAN, LAURA ZIEGLER, MINDFREEDOM INTERNATIONAL, JUDI

CHAMBERLIN, ROBERT WHITAKER, TERRI GOTTSTEIN, JERRY WINCHESTER, DR.

PETER BREGGIN, DR. GRACE JACKSON, DR. DAVID COHEN, BRUCE WHITTINGTON,

DR. STEPHEN KRUSZEWSKI, WILL HALL, DAVID OAKS AND ERIC WHALEN,

*Respondents.*

_____

CALABRESI, RAGGI, and CUDAHY,[*] *Circuit Judges*

_____

[*] Circuit Judge Richard D. Cudahy of the United States Court of Appeals for the
Seventh Circuit, sitting by designation.

1

Respondent James B. Gottstein appeals a permanent injunction entered by the United States District Court for the Eastern District of New York (Weinstein, *J.*), prohibiting him from disseminating certain documents produced by Eli Lilly & Co. pursuant to product-liability litigation involving the drug, Zyprexa. *See In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007). We agree with the district court that Mr. Gottstein's actions in acquiring and disseminating certain of these documents involved his aiding and abetting a violation of the court's protective order through the use of sham subpoenas. The district court had the power to enjoin Mr. Gottstein in these circumstances.

AFFIRMED.

STEVEN BROCK (Leslie R. Bennett, Berkman, Henoch, Peterson & Peddy, P.C., Garden City, New York, D. John McKay, Anchorage Alaska, *on the brief*), Berkman, Henoch, Peterson & Peddy, P.C., Garden City, New York.

NINA M. GUSSACK, (Sean P. Fahey, Paul V. Avelar, Pepper Hamilton, LLP, Philadelphia, Pennsylvania, Samuel J. Abate Jr., Pepper Hamilton LLP, New York, New York, *on the brief*), Pepper Hamilton, LLP, Philadelphia, Pennsylvania.

RICHARD D. CUDAHY, *Circuit Judge*: The present appeal arises from the flouting of a protective order entered in high-stakes litigation concerning Eli Lilly Co.'s anti-psychotic drug, Zyprexa. David S. Egilman, a plaintiff's expert witness and signatory to the protective order, received confidential documents produced by Eli Lilly. Finding much to dislike in the content of those documents, Egilman wished to distribute them to the media. Not wanting to release the

2

documents to the public in a manner brazenly in disregard of the protective order, he needed a suitably minded individual to act as his partner and to subpoena those documents. Egilman contacted *New York Times* reporter Alex Berenson, who put him in touch with Alaska attorney and mental-health advocate James B. Gottstein, who readily agreed to help. Gottstein, who was not a signatory to the protective order, intervened in an unrelated Alaskan guardianship case, which he used to generate subpoenas purporting to require Egilman to produce all documents in his possession pertaining to Zyprexa. Failing to abide by the terms of the protective order, Egilman distributed a large volume of documents to Gottstein, who in turn copied and forwarded them to a variety of other interested parties. The next day, the *Times* began a series of front-page articles based on the information contained in those documents.

Understandably alarmed, Eli Lilly applied for and received a series of orders culminating in an injunction, which barred Gottstein from disseminating the documents and required their return. *In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007). Gottstein now appeals that injunction, claiming that the district court erred in finding that his issuing subpoenas was part of a sham proceeding, that he aided and abetted the violation of the protective order, that the documents at issue were confidential, that the court could bind him under the protective order and that the court possessed personal jurisdiction to issue the injunction against him. We affirm the judgment of the district court in all respects.

## BACKGROUND

Approximately twenty-million schizophrenia patients have taken the anti-psychotic drug Zyprexa, which some allege has produced negative side effects purportedly known to, but not

disclosed by, the drug's manufacturer, Eli Lilly Co. Some 30,000 lawsuits ensued, which were consolidated pursuant to 28 U.S.C. § 1407 and assigned to the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York. *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380 (J.P.M.L. 2004). That court entered a protective order, Case Management Order 3 (CMO-3), which facilitated litigants' sharing of confidential discovery. *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2004 WL 3520247 (E.D.N.Y. Aug. 9, 2004). Among other things, CMO-3 allowed attorneys to share confidential documents with experts, required experts to sign an "Endorsement of Protective Order" and provided a mechanism to dispute whether a document marked confidential had been correctly designated. The protective order contemplated another court's subpoenaing produced materials, but required that the designee of the subpoena notify the producing party in writing prior to the production of confidential materials and allow it a reasonable opportunity to object.

At some point during the litigation, one of the plaintiffs' firms, The Lanier Law Firm, retained Dr. David Egilman as a potential expert witness. Having first attempted to modify it, Egilman signed the Endorsement of Protective Order.[1] The firm sent myriad documents produced by Eli Lilly to Egilman so that he could begin preparing his expert testimony. Egilman ultimately received some half-a-million documents and became quite determined to share their contents with the media. He contacted *New York Times* reporter Alex Berenson and explained his interest. Egilman understood that he was subject to CMO-3, however, and thus required an

---

[1] Egilman first attempted to make significant modifications to the Endorsement of Protective Order, but the retaining firm quickly insisted that that was out of the question. They allowed, though, that he could follow the agreement not to disclose confidential materials with the written-in line "unless this conflicts with any other sworn statements." This modification, while portending the later mass disclosure of confidential material, is not relevant to the present appeal.

4

accomplice to subpoena the documents. Berenson put Egilman in touch with James B. Gottstein for that very purpose.

Gottstein is an Alaskan attorney and an advocate for patients' rights. After talking to Egilman about Eli Lilly's confidential documents and their mutual desire to see those materials disseminated to the public, Gottstein intervened in an unrelated case in which the Alaskan Office of Public Advocacy had been granted guardianship and the right to make treatment decisions for a patient, William Bigley. At that time, Gottstein had no idea if the patient had taken Zyprexa or if the state would use Zyprexa in its treatment of the patient. Yet within hours of intervening, he issued a subpoena that purported to compel Egilman to produce all documents in his possession relating to that particular drug. Despite being addressed to Egilman in Massachusetts, however, the subpoena issued from the Superior Court for the State of Alaska. Gottstein placed the request for documents pertaining to Zyprexa in the middle of requests for documents relating to 14 other drugs, none of which he expected Egilman to possess. The subpoena, issued on December 6, 2006, called for production of the material by December 20.

In an effort to comply, however perfunctorily, with CMO-3, Egilman faxed a note and copy of the subpoena to Eli Lilly's corporate general counsel. He did not, however, inform the firm that retained him of the subpoena; nor did he apprise Eli Lilly's litigation counsel. Nevertheless, the fax was routed internally and, on December 13, the Lanier Law Firm told Egilman not to produce any documents until Eli Lilly's planned motion to quash the subpoena had been ruled upon in the Alaskan court. Unbeknownst to Lanier and Eli Lilly, however, Egilman had already begun to distribute a plethora of documents to Gottstein the day before.

This clandestine production of Eli Lilly's documents resulted from Gottstein's having

served an amended subpoena on December 11, which called for the production of the documents prior to the date and time set for the deposition. This subpoena, again purporting to bind Egilman in Massachusetts, also issued from the Superior Court for the State of Alaska. In violation of the protective order, Egilman informed no one of this second subpoena and began transmitting documents electronically to Gottstein on December 12. Gottstein immediately disseminated the documents to a number of associates.

Realizing the magnitude of the information breach, Eli Lilly took the matter to the Special Master for Discovery, Peter H. Woodin, who ordered Gottstein and Egilman to return all material immediately. Gottstein refused to acknowledge the Special Master's authority over him, so Eli Lilly took the matter up with Magistrate Judge Roanne L. Mann, who determined that Gottstein had aided and abetted a breach of CMO-3. Eli Lilly then took the matter to District Judge Brian M. Cogan, who was sitting as a miscellaneous-duty judge and who issued a temporary injunction. The MDL court extended Judge Cogan's injunction pending a full hearing on the matter, which it conducted on January 16 and 17, 2007. The MDL court issued an injunction on February 13, from which Gottstein now appeals.

**DISCUSSION**

**I.     The district court did not abuse its discretion when it characterized the Alaskan subpoenas as a "sham" and found that Gottstein aided and abetted Egilman's violation of the protective order**

Gottstein challenges the district court's factual determination that the subpoenas he caused to be served on Egilman were a "pretense." He also contests the district court's closely

6

related finding that he aided and abetted the violation of CMO-3.[2] *Id.* at *passim*. We review such factual conclusions for abuse of discretion, "which may be found where the Court, in issuing the injunction, relied on clearly erroneous findings of fact or an error of law." *Knox v. Salinas*, 193 F.3d 123, 129 (2d Cir. 1999); *see also In re Complaint of Messina*, 574 F.3d 119, 128 (2d Cir. 2009) (holding that we will overturn the factual findings of the district court only where we have a "definite and firm conviction that a mistake has been committed") (internal quotation marks omitted).

The district court's finding that Gottstein conspired with Egilman to violate CMO-3 is amply supported by the record. Egilman called Gottstein on November 28, 2006, explaining that he possessed secret Zyprexa documents produced through litigation and that they "contained some alarming things in them." He informed Gottstein that the documents were under a protective order.[3] Understanding that Egilman would not produce the Zyprexa documents except pursuant to a subpoena, Gottstein needed to find an appropriate case as a vehicle with which to generate one. Gottstein obtained Egilman's contact information for the subpoena, as well as the latter's email and phone number. Egilman knew that Gottstein intended to distribute the Zyprexa documents when he obtained them.

There is therefore no question that Gottstein and Egilman were in close contact with one

---

[2] It is clear that Egilman violated the protective order by failing to inform Eli Lilly of the second subpoena, which required an earlier production date. *See In re Zyprexa Injunction*, 474 F. Supp. 2d at 395. Egilman would also appear to have contravened CMO-3 by failing to provide Eli Lilly with a reasonable opportunity to object to production with respect to the first subpoena.

[3] As he testified, Gottstein understood Egilman's reluctance to send him a copy of the order as an effort to avoid his later being charged with knowledge of its contents. Gottstein did not try to convince Egilman to provide him with a copy of CMO-3.

7

another and strategized how best to facilitate the dissemination of documents protected by CMO-3. The subpoenas served on Egilman merely formalized and facilitated what had already been agreed to. They both understood that issuing a subpoena was a necessary ploy for achieving that distribution in a fashion ostensibly consistent with the protective order to which Egilman was bound as a signatory. It is therefore unsurprising that the manner in which Egilman and Gottstein responded to the subpoenas and caused them to issue, respectively, was designed to delay Eli Lilly's learning of them and taking action to prevent production. Neither Gottstein nor Egilman informed Eli Lilly's litigation counsel or the Lanier Law Firm of the first subpoena—actions that both knew would have resulted in Eli Lilly's learning of the subpoena's existence promptly. Nor did either of Gottstein and Egilman inform anyone else of the second, secret subpoena, which called for earlier production. They hindered Eli Lilly's recognizing the purpose of the subpoenas by burying the request for Zyprexa documents in the middle of requests for documents for some 14 other drugs. This is all strong evidence of Gottstein and Egilman's acting in concert.

Further evidence of the subpoena's being a sham abounds, and this similarly evidences the fact of concert between Egilman and Gottstein. When introduced to Egilman through Berenson, Gottstein wasted no time in planning an end run around the protective order. He searched for, found and then intervened in a case of state guardianship that was wholly unrelated the Zyprexa litigation. Gottstein admitted that he had no evidence at the time of causing the subpoenas to be served on Egilman that Zyprexa was relevant to the case in which he had intervened. On receipt of the material, Gottstein quickly disseminated it to a list of recipients without even reviewing it or applying it to his Alaskan patient's case. It bears noting, too, that

the subpoenas *duces tecum* issued through the Alaskan state court were presumably without legal force in Massachusetts, where Egilman resided and was served.[4] This further supports the district court's determination that the subpoenas were a sham.

In sum, the record is unequivocal that Gottstein schemed with Egilman to bypass the protective order and, in fact, aided and abetted the latter's violation of the same. It is equally clear that the subpoenas issued to Egilman were part of a sham proceeding. The district court did not err, let alone clearly err, in so finding.

Faced with these clear facts, Gottstein is forced to resort to a variety of unavailing assertions. First he contends that, because at least one of his two purposes was supposedly proper, the district court erred in characterizing the subpoenas as a pretense. He relies on *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995) and focuses on that court's holding that a party "should not be penalized for or deterred from seeking warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper." *Id.*

---

[4] *See, e.g.*, *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) (holding that "the subpoena power of a court cannot be more extensive than its jurisdiction"); *Houston Business Journal, Inc. v. Office of Comptroller of Currency*, 86 F.3d 1208, 1213 (D.C. Cir. 1996) ("In general, a state-court litigant seeking to compel a non-party to produce documents must use the state court's subpoena power or, if the non-party is beyond the jurisdiction of such court, use whatever procedures another state may provide."); *Jaynes v. Jaynes*, 496 F.2d 9, 10 (2d Cir. 1974); *John Deere Co. v. Cone*, 124 S.E.2d 50, 53 (S.C. 1962) (observing that a subpoena directed to an out-of-state entity is "ineffectual" because "the courts of this state are without jurisdiction over persons or property outside of its territory"); Rhonda Wasserman, *The Subpoena Power:* Pennoyer*'s Last Vestige*, 74 MINN. L. REV. 37, 67 n.135 (1989) ("As a general rule, subpoenas *duces tecum*, like subpoenas *ad testificandum*, have been restricted to the territory of the state."); *cf.* ALASKA STAT. § 12.50.010 (2010) (establishing procedures for recognition and enforcement of subpoenas issued by non-Alaska courts in criminal matters). This principle is enshrined the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 45(a)(2), 45(b)(2), 45(c)(3)(A)(ii), 45(e).

at 459. Of course, *Sussman* was concerned with the distinct issue of a plaintiff's being subject to Fed. R. Civ. P. 11 sanctions for filing a nonfrivolous complaint pursuant to an improper purpose. *Id.* But even putting this distinction aside, Gottstein's reliance on *Sussman* necessarily flounders on the fact that he is incapable of demonstrating that any of his purposes in subpoenaing and disseminating Eli Lilly's confidential documents was proper.

Gottstein asserts that his "dual purposes" were " to obtain evidence for use in Bigley's case and other future cases, and [to] make evidence of suppressed hazards or illegal marketing or other evidence of Zyprexa hazards and Lilly [sic] misconduct known to the public." However, the qualitative nature of a "purpose" cannot be divorced from the manner in which it is pursued. Even if we were to assume that either of his proffered goals in subpoenaing Egilman were otherwise legitimate, the fact of his aiding and abetting the violation of a lawful protective order to achieve that end precludes our finding a proper purpose. Gottstein appears to focus on the discrete act of his causing the two subpoenas to issue, essentially asking that we consider those actions divorced from the larger context of which they were a part. Yet we have already determined that the district court was on firm ground in finding that Gottstein's actions—including his serving Egilman with the two subpoenas—aided and abetted Egilman's violation of the protective order. Causing a subpoena to be served, with notice that compliance with it by the complicit recipient would violate a court's lawful order, cannot be characterized as "legitimate," even if the improperly obtained documents might otherwise be useful had they been obtained appropriately. Ultimately, Gottstein's nebulous assertion that the subpoenas were somehow "grounded in law and fact" does not legitimize the manner in which they were

employed to facilitate the violation of a court's order; nor does it take away from their being part of a sham proceeding.

Gottstein's second argument is no more fruitful. He submits that he acted independently as a lawyer in the interests of his client, which, he contends, precludes any finding that he aided and abetted Egilman's violation of the protective order. To support this conclusion, Gottstein focuses on *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945), for the proposition that a nonparty who "act[s] independently" of a party found in violation of a court order cannot be an aider and abettor if the nonparty's actions were based on a "genuinely independent interest." Gottstein contends that he had an interest in the documents that was independent of Egilman's. Of course, the record does not support a finding that Gottstein acted independently of Egilman, which is the end of the matter. Aiding and abetting a party is not acting independently, as Gottstein himself admits. We would also point to our prior decision in *N.Y. State Nat'l Org. for Women v. Terry*, where we held that a court's inquiry into the fact of aiding and abetting is "directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation." 961 F.2d 390, 397 (2d Cir. 1992), *vacated on other grounds sub nom.*, *Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan)*, 507 U.S. 901 (1993).

Ultimately, the district court's finding that Gottstein acted in concert with Egilman to release the confidential material, and related determination that Gottstein aided and abetted Egilman's violation of CMO-3, seem to us the only reasonable conclusions in light of the facts in the record. The district court certainly did not abuse its discretion in so finding.

**II.     Gottstein's challenges to the protective order fail**

Gottstein challenges the protective order on a number of grounds, all of which fail. He asserts first that the "district court erred by assuming 'inherent authority' to use its power to enforce injunctions under Rule 65(d) to enforce a protective order under Rule 26(c) instead." We reject this argument by virtue of the obvious fact that the district court did not enforce CMO-3 against Gottstein—an order to which Gottstein was not privy. Gottstein seems to miss the fact that the injunction against which he appeals merely "enjoined him from further disseminating" the "documents produced by Eli Lilly and Company subject to CMO-3" and required him "forthwith [to] return any such documents and copies still in his . . . possession . . .." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 430. It did not purport to bind Gottstein to the provisions of the protective order. *Id.* at *passim*. Thus, Gottstein's assertion that the court "enforce[d] a protective order under Rule 26(c)" against him is wholly mistaken. Nor, as Gottstein contends, did the court impose aiding-and-abetting "liability." The district court made this abundantly clear, observing that "this is not a contempt proceeding, and the court is not now punishing anyone for any alleged violation of court orders. Rather, this proceeding seeks to prevent irreparable harm to Lilly by enjoining those persons whose actions threaten such harm." *Id.* at 426.

Gottstein next argues that the substantive provisions of the protective order were insufficiently detailed, since they did not delineate the acts sought to be restrained and failed "to provide nonparties with a specific and detailed description of the acts required or prohibited." These contentions are unavailing. First, it is unclear why a protective order would seek to dictate the boundaries of permissible behavior by non-signatories. Such individuals can only be enjoined when their actions amount to aiding and abetting a violation of the order by a person

12

who is privy to it. In that sense, Gottstein's objection to the order's supposed lack of specificity as to appropriate third-party conduct collapses into his argument that the order's existing provisions are impermissibly vague. He argues on this latter ground that the order's requirement that parties be given a "reasonable opportunity" to object before any disclosure is effected is "too vague to be enforced." Gottstein's contention is border-line disingenuous, however, in light of his election not to read the protective order before aiding and abetting its violation. In any event, the challenged phrasing, familiar from other contexts, *see, e.g.*, Fed. R. Civ. P. 12(d); Fed. R. Crim. P. 5(d)(2), 6(e)(3)(G), 32.1(c)(2)(C), hardly constitutes abuse of what the district court accurately described as its "broad discretion to tailor protective orders to the circumstances of a particular litigation." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 413.

**III. Gottstein submitted himself to the personal jurisdiction of the Eastern District of New York when he aided and abetted a violation of the court's order**

Gottstein makes a further argument. He contends that the district court lacked jurisdiction to enjoin a nonparty who aided and abetted the violation of a protective order.

It is of course true that courts cannot enjoin the entire universe of potential violators of its orders. In *Regal Knitwear*, the Supreme Court held that those who are acting independently of the enjoined party and whose own rights have not been adjudged cannot be bound by an injunction. 324 U.S. at 1314. Yet, third parties "who are in active concert or participation" with the parties, their officers, agents, servants, employees or attorneys, can be enjoined. Fed. R. Civ. P. 65(d)(2). This language gives force to injunctions and prevents parties from violating them by proxy. "[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and

13

abettors, although they were not parties to the original proceeding." *Regal Knitwear*, 324 U.S. at 14.

While the instant case deals with an injunction, it is an injunction founded on a nonparty's aiding and abetting the violation of a protective order. Thus, we must consider whether aiding and abetting the breach of such an order gives the issuing court jurisdiction over the nonparty aider and abettor to enjoin him from continuing those actions.

Gottstein contends that we should adopt a rule saying that district courts have jurisdiction only over parties and signatories to their discovery orders, such that courts are powerless to enjoin the actions of other entities that aid and abet the violation of those orders. In support of his argument, Gottstein distinguishes orders created under Rule 26(c) from Rule 65 injunctions and points out that, while Rule 65 textually allows third-party aiders and abettors to be enjoined, Rule 26 does not.

His argument fails for multiple reasons. First, Rule 26 neither provides nor suggests that courts lack the power to enjoin nonparties or nonsignatories who aid and abet the violation of their discovery orders. Second, relevant case law is against Gottstein's position. *See, e.g.*, *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985) ("Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order."). Third, a protective order might be thought of as a form of injunction in this particular setting, in which case reading Rules 26 and 65 together would obviously foreclose Gottstein's argument. *See, e.g.*, *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993) ("[A] protective order, like any ongoing injunction, is always subject to the inherent power of the district court....").

14

Fourth, if taken to its logical conclusion, Gottstein's proposed rule would render protective orders little more than liability-generating documents. If courts cannot bind third parties who aid and abet the violation of their protective orders, then any party, agent, attorney or expert who comes into possession of material he wanted to use against the producing party could simply disseminate the information quickly, then deal with the damages issue after the fact. We understand that the threat of a sizable damages award may deter this action in some cases, but Gottstein's proposed rule would eviscerate courts' ability to manage discovery and, hence, litigation.

Egilman and Gottstein shared the common plan to violate CMO-3 and to disseminate Eli Lilly's confidential material. This is the only reason Egilman sought Gottstein's involvement and is also clearly the reason that Gottstein intervened in the Alaska case and generated the subpoenas. As he issued the subpoenas, burned DVD copies, forwarded emails and sent packages containing the data to associates, Gottstein actively took part in and furthered that shared goal. Therefore, Gottstein aided and abetted Egilman's violation of the protective order. The resulting injunction is a perfectly appropriate device to foreclose further dissemination of the confidential documents produced under the protective order.

**IV.     The district court did not clearly err in finding that the documents distributed by Gottstein and his conspirators included a substantial number that were confidential**

The district court "examined a sampling of the documents distributed by the conspirators," concluded that "[a]mong them [were] a substantial number whose publication would be annoying, embarrassing, oppressive, and burdensome to Lilly" and further observed that "they reveal trade secrets, confidential preliminary research, development ideas, commercial

15

information, product planning, and employee training techniques." *In re Zyprexa Injunction*, 474 F. Supp. 2d at 404. The district court did not clearly err in reaching this conclusion.

Gottstein contends that the documents he transmitted were not confidential, as evidenced by a variety of subsequent developments outside the record on appeal. This argument is not properly before us and should be raised in front of the district court in the first instance. *See Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972) (observing that "where circumstances have changed between the ruling below and the decision on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances"). Gottstein also devotes considerable pages to arguing that Eli Lilly's mass designation of documents as confidential violated CMO-3 because such designation was not made in good faith. He unconvincingly attempts to bolster this conclusory assertion by arguing for "[t]he inference that one of Lilly's motivations for over-designation of documents as confidential under CMO-3 was to avoid civil and criminal liability." His argument is in any event misguided, since the question whether Eli Lilly designated its produced documents in good faith is distinct from the question whether those subject to the protective order were free to ignore it. If Egilman or Gottstein believed that particular documents were improperly designated as confidential, then the proper procedure was for either of them to avail himself of the procedure envisioned by CMO-3 for declassifying such documents. What Gottstein was not entitled to do was to aid and abet Egilman's violation of the protective order on the ground that that order had been improperly entered. *See In re Criminal Contempt Proceedings*, 329 F.3d 131, 138 (2d Cir. 2003) (observing that "it is well settled that persons subject to an injunctive

16

order . . . are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order") (internal quotation marks omitted).

**V.      The motions for judicial notice and to strike are denied**

Gottstein moves for us to take judicial notice of materials not presented below.  Eli Lilly moves in response to strike those portions of Gottstein's brief referencing extra-record materials. We decline to take judicial notice of those materials and so deny Gottstein's motion for judicial notice and also deny Eli Lilly's motion to strike on the ground of mootness.  In light of our foregoing discussion, however, it should be clear that our granting Gottstein's motion would not change our analysis; nor would it affect the result we reach.

**CONCLUSION**

For the foregoing reasons, Gottstein's motion for judicial notice is DENIED, Eli Lilly's motion to strike is DENIED as moot and the judgment of the district court is AFFIRMED.